IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-363

 Filed: 16 August 2016

Onslow County, No. 13CRS054065

STATE OF NORTH CAROLINA

 v.

AMANDA GAYLE REED, Defendant.

 Appeal by defendant from judgment entered on or about 6 October 2014 by

Judge Charles H. Henry in Superior Court, Onslow County. Heard in the Court of

Appeals 21 October 2015.

 Attorney General Roy A. Cooper III, by Special Deputy Attorney General Melody
 R. Hairston, for the State.

 The Coxe Law Firm, PLLC, by Matthew C. Coxe, for defendant-appellant.

 STROUD, Judge.

 Defendant appeals her convictions for misdemeanor child abuse and

contributing to the delinquency of a juvenile. For the following reasons, we conclude

that defendant’s convictions must be vacated.

 I. Background

 The facts of this case, as presented by the State, begin simply enough:

defendant went to use the bathroom in her home for a few minutes, and her toddler,

Mercadiez, tragically managed to fall into their outdoor pool and drown. The
 STATE V. REED

 Opinion of the Court

complexity of this case arises from the fact that about two years before, defendant

was babysitting another child, Sadie Gates, who got out of the house and drowned

just outside of her home. Defendant was indicted, tried, and convicted by a jury of

misdemeanor child abuse and contributing to the delinquency of a juvenile for

Mercadiez’s death. Defendant appeals.

 II. Defendant’s Appeal

 Defendant makes three separate arguments on appeal: (1) the trial court erred

in denying her motion in limine to exclude the evidence of Sadie’s death because it

was not an appropriate use of evidence under North Carolina Rule of Evidence 404(b)

regarding prior crimes and bad acts and it should have been excluded pursuant to

North Carolina Rule of Evidence 403 because the probative value of the evidence did

not substantially outweigh the unfair prejudice; (2) the trial court erred in denying

defendant’s motions to dismiss because there was not substantial evidence of each

essential element of the crimes charged; and (3) the State went so far beyond the

scope of the appropriate use of the admitted Rule 404(b) evidence in its questioning

and arguments to the jury that it amounted to plain error in defendant’s trial.

 This panel has struggled mightily on this case. While defendant’s issues may

seem typical for a criminal appeal, unfortunately, an analysis of these issues has

turned out to be quite complex, but we have addressed each issue, since we believe

that all are interrelated as they appear in this case and all have merit.

 -2-
 STATE V. REED

 Opinion of the Court

 III. Motions to Dismiss

 Defendant argues that “the trial court erred by denying [her] motions to

dismiss all three of the charges at the close of the State’s evidence and at the close of

all the evidence.” (Original in all caps.) The jury found defendant not guilty of

involuntary manslaughter, and thus we address only the crimes for which defendant

was convicted: misdemeanor child abuse and contributing to the delinquency of a

juvenile.

 This Court reviews the trial court’s denial of a
 motion to dismiss de novo. On a motion to dismiss for
 insufficiency of evidence, the question for the Court is
 whether there is substantial evidence (1) of each essential
 element of the offense charged, or of a lesser offense
 included therein, and (2) of defendant’s being the
 perpetrator of such offense. If so, the motion is properly
 denied. Substantial evidence is such relevant evidence as
 a reasonable mind might accept as adequate to support a
 conclusion. In making its determination, the trial court
 must consider all evidence admitted, whether competent or
 incompetent, in the light most favorable to the State, giving
 the State the benefit of every reasonable inference and
 resolving any contradictions in its favor.

State v. Clark, 231 N.C. App. 421, 423, 752 S.E.2d 709, 711 (2013) (citations and

quotation marks omitted), disc. review denied, 367 N.C. 322, 755 S.E.2d 619 (2014).

A. Misdemeanor Child Abuse

 Turning to defendant’s conviction for misdemeanor child abuse, North

Carolina General Statute § 14-318.2(a) provides,

 Any parent of a child less than 16 years of age, or any other

 -3-
 STATE V. REED

 Opinion of the Court

 person providing care to or supervision of such child, who
 inflicts physical injury, or who allows physical injury to be
 inflicted, or who creates or allows to be created a
 substantial risk of physical injury, upon or to such child by
 other than accidental means is guilty of the Class A1
 misdemeanor of child abuse.

N.C. Gen. Stat. § 14-318.2(a) (2013). North Carolina General Statute § 14-318.2(a) is

awkwardly worded, and it is not immediately clear what the phrase “by other than

accidental means” is modifying, but our Supreme Court has clarified that issue: “This

statute provides for three separate offenses: If the parent by other than accidental

means (1) inflicts physical injury upon the child, (2) allows physical injury to be

inflicted upon the child, or (3) creates or allows to be created a substantial risk of

physical injury.” State v. Fredell, 283 N.C. 242, 244, 195 S.E.2d 300, 302 (1973). In

other words,

 To convict defendant of misdemeanor child abuse,
 the State needed to prove only one of the following
 elements: (1) that the parent nonaccidentally inflicted
 physical injury on the child; (2) that the parent
 nonaccidentally allowed physical injury to be inflicted on
 the child; or (3) that the parent nonaccidentally created or
 allowed to be created a substantial risk of physical injury
 on the child.

State v. Armistead, 54 N.C. App. 358, 360, 283 S.E.2d 162, 164 (1981). Furthermore,

“G.S. 14-318.2(a), contemplates active, purposeful conduct” on the part of the

defendant. State v. Hunter, 48 N.C. App. 656, 660, 270 S.E.2d 120, 122 (1980).

 -4-
 STATE V. REED

 Opinion of the Court

 Because this Court is required to consider the evidence “in the light most

favorable to the State, giving the State the benefit of every reasonable inference and

resolving any contradictions in its favor” at this point we would normally turn only

to the evidence presented in the State’s case in chief to determine whether there was

“substantial evidence” of “each essential element of the offense charged[.]” Clark, 231

N.C. App. at 423, 752 S.E.2d at 711. But in this case, defendant presented direct

evidence which does not conflict with the State’s evidence, and although the charges

against defendant should have been dismissed even without consideration of her

evidence, in this case, consideration of her evidence is more than appropriate; here,

it is required. See generally State v. Bates, 309 N.C. 528, 535, 308 S.E.2d 258, 262-63

(1983) (“[O]n a motion to dismiss, the court must consider the defendant’s evidence

which explains or clarifies that offered by the State. The court must also consider the

defendant’s evidence which rebuts the inference of guilt when it is not inconsistent

with the State’s evidence.”).

1. Consideration of Defendant’s Evidence

 Generally, the defendant’s evidence is disregarded when deciding whether the

evidence is sufficient to submit the charged offenses to the jury unless that evidence

is favorable to the State. See generally State v. Nabors, 365 N.C. 306, 312, 718 S.E.2d

623, 627 (2011) (“The defendant’s evidence, unless favorable to the State, is not to be

taken into consideration.” (citation and quotation marks omitted)). “However, if the

 -5-
 STATE V. REED

 Opinion of the Court

defendant’s evidence is consistent with the State’s evidence, then the defendant’s

evidence may be used to explain or clarify that offered by the State.” Id. (citation and

quotation marks omitted). Indeed, our Supreme Court has noted that “[w]e have

consistently held that on a motion to dismiss, the court must consider the defendant’s

evidence which explains or clarifies that offered by the State. The court must also

consider the defendant’s evidence which rebuts the inference of guilt when it is not

inconsistent with the State’s evidence.” Bates, 309 N.C. at 535, 308 S.E.2d at 262-63.

 A comparison of the evidence presented by the State and the defendant in

Bates is helpful to illustrate how defendant’s evidence should be used in this

situation. Id. at 529-32, 308 S.E.2d at 260-61. In Bates, the State’s evidence was

summarized by the Supreme Court as follows:

 The State offered evidence tending to show that at
 around 11:00 p.m. on 6 January 1982, defendant came to
 the residence of Mrs. Mary Godwin at 307 Kenleigh Road
 in Fayetteville, North Carolina. Mrs. Godwin testified
 that defendant appeared to be severely injured and was
 pleading for help. She stated that defendant’s clothing was
 covered with blood and dirt. A nurse at Cape Fear Valley
 Hospital, Mrs. Godwin attempted to render first aid
 assistance to defendant Bates and immediately called an
 ambulance and the Cumberland County Sheriff's
 Department.
 Deputy John Dean responded to Mrs. Godwin’s call.
 Deputy Everette Scearce arrived shortly thereafter and
 began to search the area around the Godwin residence. In
 a field approximately 300 feet from the house, Scearce
 discovered the body of Roy Lee Warren, Jr., lying beside an
 automobile. Warren’s body was partially covering what
 appeared to be a lead pipe approximately 18 inches in

 -6-
 STATE V. REED

 Opinion of the Court

length. Scearce testified that he remained in the field only
a few moments before leaving to call an ambulance for
Warren.
 Conrad Rensch, a crime scene technician with the
City/County Bureau of Investigation, testified that he
received a call to come to Kenleigh Road at approximately
12:30 a.m. on 7 January. He immediately proceeded to the
field and began his investigation of the crime scene. He
observed that there were numerous scuff marks in the dirt
surrounding the body and he detected spots of blood on the
car.
 Items of personal property belonging to both Bates
and Warren were discovered in an area near the edge of the
field. These items ranged in distance from approximately
73 feet to 116 feet from Warren’s body and were generally
located within 25 feet of each other. A watch, keys, wallet,
checkbook and calculator were identified as the victim’s
possessions, while a gauze bandage, gold neck chain and
jacket were determined to belong to defendant. Rensch
noted that there were scuff marks near several of the items
and that the ground was covered with blood in some places.
 Rensch also testified that he found a .22 caliber
revolver in a grassy area not far from the other items.
Douglas Branch, a ballistics expert with the State Bureau
of Investigation, stated that in his opinion a bullet
recovered from the decedent’s body was fired from the
revolver discovered in the field. Rensch related that there
was a large amount of blood near the gun. He did not see
scuff marks in that area, but admitted that it was usually
difficult to find them in the grass.
 David Hedgecock is a forensic serologist employed by
the S.B.I. Crime Laboratory. He testified that after
performing laboratory tests upon blood samples removed
from Bates and Warren, he determined that defendant’s
ABO grouping was type B and the deceased’s ABO
grouping was type O. Hedgecock stated that the blood
removed from the car was type B and therefore consistent
with defendant’s blood type, but that the bloodstains found
on the ground and on the various personal items strewn
throughout the field were of both type O and B.

 -7-
 STATE V. REED

 Opinion of the Court

 The State also presented testimony of Dr. Thomas
 Bennett, a forensic pathologist. He testified that during
 the post-mortem examination of the deceased, he located
 numerous small cuts and abrasions and 32 stab wounds.
 He further identified two gunshot wounds, one to Warren’s
 right abdomen and another, a grazing wound to the left
 cheek. Dr. Bennett recovered one bullet from the body in
 the midline section.
 Dr. Bennett testified that in his opinion the gunshot
 wounds were inflicted at close range, at least within four
 feet. He further gave his opinion that the gunshot wounds
 were probably inflicted before the stab wounds.

309 N.C. at 529-31, 308 S.E.2d at 260.

 The defendant’s evidence was entirely consistent with the State’s evidence, but

explained what had happened between the defendant and the decedent:

 Defendant’s evidence, which included his own
 testimony, tended to show that he and Warren were friends
 and former co-workers at the Food Town grocery.
 Defendant Bates testified that a few days prior to 6
 January 1982, Warren asked him if he had a gun.
 Defendant replied that he did not have one, but that his
 mother did. Defendant asked Warren to meet him in the
 field on Kenleigh Road and there gave Warren his mother’s
 .22 caliber revolver. Defendant acknowledged that Warren
 gave him $30.00 for the weapon, although he maintained
 that he did not ask for any money in exchange for the gun.
 Defendant further testified that, on 6 January, he
 went to the Food Town where Warren worked and asked
 him to return the pistol because his mother had discovered
 that it was missing. Warren offered to bring the gun to
 defendant’s home later that evening, but defendant told
 Warren he would rather meet at the same field on Kenleigh
 Road so his mother would not see them. Warren agreed
 and told defendant to watch for him around 7:00 p.m.
 Defendant stated that he lived near the field and watched
 for Warren’s car from his bedroom window. Warren

 -8-
 STATE V. REED

 Opinion of the Court

arrived at the field at around 10:00 p.m. and defendant
then walked out to meet him.
 Defendant testified that he and the decedent had a
disagreement over the gun because Warren refused to
return it until defendant gave him $30.00. After Warren
consistently refused to relinquish the weapon without
payment, defendant said he would have to tell his mother
where the gun was. As he rose and turned to get out of the
car, defendant testified that Warren stabbed him in the
back. Defendant remembered that he stumbled, but after
regaining his balance he began to run in the direction of
the nearest house. Because defendant had a cast on his leg
from a football injury, he did not run to his own home
because it was farther away and he was afraid he would
not make it.
 Defendant testified that Warren fired one or two
gunshots and shouted something like, “If you don’t stop
running, I'll kill you.” Defendant stated that he stopped
running and Warren caught up with him in the general
area where most of the items of personal property were
later found. Defendant stated, however, that he did not
recall seeing any of the decedent’s possessions.
 Defendant testified that Warren approached him
and hit him across the forehead with the gun. Defendant
fell to the ground, Warren jumped on him and they started
to fight. Defendant related that at one point during the
tussle, he tried to wrestle the gun from the decedent. He
testified that the gun went off while he and Warren were
fighting on the ground, although he was unaware that a
bullet had struck the decedent.
 Eventually, defendant was able to break free from
Warren and he crawled back toward the car. Defendant
testified that he was about to enter the car when Warren
grabbed him from behind and pulled him to the ground.
Defendant stated that when he opened the door to get into
the car, a metal pipe rolled out from the floorboard and onto
the ground.
 Defendant remembered tussling with Warren beside
the car and receiving a second stab wound to the chest. He
testified that he pulled the knife from his chest and began

 -9-
 STATE V. REED

 Opinion of the Court

 to stab the decedent. At some point, Warren fell off of
 defendant and, shortly thereafter, defendant lost
 consciousness. He later wakened and made his way to the
 Godwin residence on Kenleigh Road.

Id. at 531-32, 308 S.E.2d at 260-61.

 The jury convicted the defendant in Bates of felony murder and robbery with a

firearm. Id. at 533, 308 S.E.2d at 262. The defendant argued on appeal that his

motion to dismiss the charge of robbery with a firearm should have been allowed “for

insufficiency of the evidence[,]” id., and the Supreme Court agreed and expressly

based its determination upon consideration of the “defendant’s uncontroverted

testimony[.]” Id. at 535, 308 S.E.2d at 262. The Court explained that the

 [d]efendant’s uncontroverted testimony refutes a
 conclusion that he forcibly took these items of personal
 property from the victim with the intent to steal them.
 We have consistently held that on a motion to
 dismiss, the court must consider the defendant’s evidence
 which explains or clarifies that offered by the State. The
 court must also consider the defendant’s evidence which
 rebuts the inference of guilt when it is not inconsistent with
 the State’s evidence.
 Defendant Bates’ testimony in its entirety must be
 characterized as a clarification of the State’s testimonial
 and physical evidence; it in no way contradicted the
 prosecution’s case.
 Defendant’s testimony and the physical evidence
 reveal that a brutal fight took place between Bates and
 Warren. Blood of both defendant and the deceased was
 found on the items of personal property, on the hood of the
 automobile and on the ground. Conrad Rensch testified
 that there were numerous scuff marks in the dirt
 surrounding the automobile and in other areas in the
 clearing. It is also important to note that items of personal

 - 10 -
 STATE V. REED

 Opinion of the Court

 property belonging to defendant were also scattered
 throughout the field. Defendant testified that he never saw
 decedent’s possessions nor was he aware of how they came
 to be strewn around the area.
 When defendant’s explanatory testimony is
 considered along with the physical evidence presented by
 the State, the logical inference is that the decedent lost
 these items of personal property during the struggle with
 defendant. There is simply no substantial evidence of a
 taking by defendant with the intent to permanently
 deprive Warren of the property. We therefore hold that
 defendant’s motion to dismiss the charge of robbery with a
 dangerous weapon should have been granted.
 We further note that defendant was found not guilty
 of premediated and deliberated murder. He was convicted
 of felony murder, premised upon the commission of armed
 robbery. Because there was insufficient evidence to
 support the commission of the underlying felony, there is
 also insufficient evidence to support defendant’s conviction
 of felony murder.

Id. at 535, 308 S.E.2d at 262-63 (emphasis added) (citations omitted).

 Under the circumstances of this case, as discussed in more detail herein,

defendant’s motion to dismiss the misdemeanor child abuse charge could only have

been properly denied if there was substantial evidence demonstrating that on 11 May

2013, defendant committed some act or omission that created or allowed to be created

a substantial risk of physical injury to Mercadiez. N.C. Gen. Stat. § 14-318.2(a); see

Clark, 231 N.C. App. at 423, 752 S.E.2d at 711. Here, defendant’s evidence is entirely

consistent with the State’s evidence, and thus must be considered, according to Bates.

Bates, 309 N.C. at 535, 308 S.E.2d at 262-63. Defendant’s evidence can also be

 - 11 -
 STATE V. REED

 Opinion of the Court

“characterized as a clarification of the State’s testimonial and physical evidence; it in

no way contradicted the prosecution’s case.” Id. at 535, 308 S.E.2d at 263.

 The State elicited testimony from Sergeant Michael Kellum of the Jacksonville

Police Department (“JPD”), who at the time of the incident was a detective with the

JPD’s criminal investigative division. Sergeant Kellum explained that he was

involved in the investigation of Mercadiez’s death and that he spoke with defendant

about the events leading up to the drowning two days after it had occurred. Sergeant

Kellum testified that defendant told him she had been in the bathroom that afternoon

for approximately five to ten minutes and that “when she went into the bathroom,

she had seen Mercadiez playing on the side concrete porch by the side door, with the

other girls, that being [Sarah] and [Sarah’s] friends from down the street.”1

Defendant further told Sergeant Kellum that upon leaving the bathroom, she saw

Sarah without Mercadiez and asked about Mercadiez’s whereabouts. Detective

Kellum’s testimony regarding the pretrial statements that defendant had made to

him was the State’s primary evidence concerning the series of events that

immediately preceded Mercadiez’s drowning. The State did not call as witnesses Mr.

Reed or any of the children who were present in the house at the time of the incident.

 1 Pseudonyms will be used to protect the identity of the other minors involved.

 - 12 -
 STATE V. REED

 Opinion of the Court

 During defendant’s case, Mr. Reed testified at length concerning the events

leading up to the drowning, clarifying and elaborating upon the State’s evidence. Mr.

Reed stated that defendant had asked him, “You got this?” before going to use the

bathroom. Mr. Reed explained that he understood defendant’s question to mean that

she was inquiring as to whether he would supervise the children while she was in the

bathroom, and he responded “[Y]es.”2 After defendant had been in the bathroom for

“not even a couple minutes[,]” he then heard defendant say, “Can’t I [use the

bathroom] in peace?”

 Mr. Reed testified that at that point he got up, walked towards the bathroom,

and on his way, observed that Mercadiez was still sitting with Sarah on the side

porch. Mr. Reed took the two other children from the bathroom into their bedroom

to watch a video. Mr. Reed then checked on one of the other children, and as he

walked back through the hall he passed defendant leaving the bathroom. Defendant

saw Sarah and immediately asked, “[W]here is Mercadiez?” Sarah responded that

she “had just put her in the house.” Defendant looked at Mr. Reed and said “[H]ey,

she’s with you.” When Mr. Reed responded that Mercadiez was not in fact, with him,

defendant and Mr. Reed began to search the house and yard and found Mercadiez in

the pool.

 2 Mr. Reed also testified that he had been on active duty in the United States Marine Corps
for the past 18 years and was attending college to become a social worker. No evidence was offered
suggesting that Mr. Reed was in any way an unsuitable caretaker.

 - 13 -
 STATE V. REED

 Opinion of the Court

 While the State’s case did not emphasize the fact that Mr. Reed was also home

with defendant at the time of Mercadiez’s drowning, the evidence the State offered

did indicate that he was at the house during the relevant period of time. Specifically,

Detective Kellum testified that Mr. Reed “came out to reach Mercadiez” from the pool.

Furthermore, Mr. Josue Garcia, defendant’s neighbor who came to perform CPR,

testified on behalf of the State that he “saw Mr. Reed with the little girl in his hands”

“frantically yelling[,]” and Mr. Reed told him Mercadiez had been in the water from

“a couple of minutes” to “seven minutes.”3 Thus, the State’s own evidence implied

that Mr. Reed was at home during the relevant time period, although it does not

specify his exact location or what he was doing at the relevant time; it in no way

indicates he was not present. Therefore, the evidence presented by defendant — in

the form of Mr. Reed’s testimony — is not in conflict with the evidence offered by the

State.

 In claiming that defendant’s evidence regarding Mr. Reed contradicted the

State’s case-in-chief, the dissent argues that the State’s evidence also referenced the

general fact that Mr. Reed was present in the home on the day of Mercadiez’s death.

Even if this were true, however, if both the State’s and defendant’s evidence noted his

presence in the home, where is the conflict? The only difference between the State’s

 3The State also stated in its opening statement that the jury would “hear that Will Reed, the
defendant’s husband, the father of this child, was also in the home at the time that Mercadiez got into
the pool and drowned.”

 - 14 -
 STATE V. REED

 Opinion of the Court

case regarding Mr. Reed’s presence and defendant’s evidence on this subject is that

the State made no effort to ascertain precisely where in the house he was immediately

prior to and during the time when defendant left to use the bathroom, whereas

defendant’s case-in-chief filled in this gap in the State’s evidence. Had the State put

on evidence placing Mr. Reed at a specific location in the home that was different

from the locations described by him during his testimony, then a conflict would exist.

However, because the State did not put on such evidence, no such conflict existed.

 In lieu of providing actual evidence from defendant’s case that contradicts the

State’s evidence, the dissent relies entirely on the fact that upon coming out of the

bathroom, defendant questioned Sarah rather than Mr. Reed as to Mercadiez’s

whereabouts. We fail to see how this is inconsistent with defendant’s evidence. The

dissent has failed to show any concrete fact offered during defendant’s case in chief

that conflicts in any way with the State’s evidence.

 Had the State offered evidence that Mr. Reed was in a different part of the

house during the time period in question or that defendant had not spoken with him

before she went into the bathroom, then the dissent would be correct that defendant's

evidence showing that Mr. Reed understood he was responsible for watching

Mercadiez while defendant was in the bathroom would conflict with the State's

evidence, and therefore, be ineligible for consideration in connection with defendant’s

motion to dismiss at the close of the evidence. See generally Nabors, 365 N.C. at 312,

 - 15 -
 STATE V. REED

 Opinion of the Court

718 S.E.2d at 627. But because the State offered no evidence at all regarding Mr.

Reed, we cannot agree with the dissent’s insistence that defendant’s evidence

confirming his precise whereabouts from the time defendant left to go to the bathroom

until the time of Mercadiez’s death somehow contradicts the State’s evidence.

 By choosing not to offer evidence at all from Mr. Reed and to instead essentially

restrict its entire case-in-chief to Sergeant Kellum’s account of his interview with

defendant, the State left the door open for defendant to fill this crucial gap in the

events leading to Mercadiez’s death by offering testimony from Mr. Reed, which is

exactly what defendant did. Given (1) the State’s strategic decision to forego calling

as a witness the only adult in the house during the relevant time period other than

defendant; and (2) the consistency of defendant’s evidence with the State’s evidence,

the dissent has failed to make any coherent argument why Mr. Reed’s testimony

should be disregarded.

 The dissent notes that when defendant left the bathroom and saw Mercadiez’s

older sister, Sarah, she asked Sarah – rather than Mr. Reed -- about Mercadiez’s

whereabouts. However, when defendant left to go to the bathroom, Mercadiez had,

in fact, been playing with her sister – while Mr. Reed was watching her. Thus, the

fact that defendant directed her question to Sarah is in no way inconsistent with the

State’s evidence. Indeed, Mr. Reed’s testimony included this same exchange between

defendant and Sarah.

 - 16 -
 STATE V. REED

 Opinion of the Court

 The dissent also appears to be arguing that defense counsel was required to

cross-examine Sergeant Kellum about Mr. Reed’s role in these events. But again, the

State chose to rely solely upon Sergeant Kellum and not to call Mr. Reed as a witness.

The burden of proof is on the State; the defendant has no burden of proof. See

generally State v. Womble, 292 N.C. 455, 459, 233 S.E.2d 534, 537 (1977) (“[N]o

burden is placed upon a defendant to prove or disprove any of the elements of the

crime[.]”). And as discussed above, our Supreme Court has consistently held that

the defendant’s evidence may -- indeed, must -- be considered in connection with a

motion to dismiss at the close of all the evidence where it supplements rather than

contradicts the State’s evidence. See Bates, 309 N.C. at 535, 308 S.E.2d at 262-63.

Thus, the fact that defense counsel opted to let the jury hear from Mr. Reed directly

on this issue in no way precluded his testimony from being considered in a ruling on

the motion to dismiss.

 Consistent with the State’s evidence, Mr. Reed testified that defendant went

to use the bathroom for approximately five to ten minutes and sometime during that

period of time, Mercadiez wandered away from the house and drowned in the

backyard pool. The State’s evidence at trial showed that defendant left Mercadiez for

a period of five to ten minutes without defendant’s supervision. However, the State

did not offer any evidence affirmatively establishing that defendant had failed to

secure adult supervision for Mercadiez, but rather only evidence that she herself was

 - 17 -
 STATE V. REED

 Opinion of the Court

not watching Mercadiez. Thus, defendant introduced evidence consistent with that

offered by the State; that is, evidence that she was not personally supervising

Mercadiez while she was in the bathroom.

 Critically, however, defendant’s consistent evidence rebutted the inference

raised by the State that she had failed to ensure her child was being properly

supervised while see went to the bathroom. See generally id. at 535, 308 S.E.2d at

263. (“The court must also consider the defendant’s evidence which rebuts the

inference of guilt when it is not inconsistent with the State’s evidence.”). The

additional evidence introduced in defendant’s case-in-chief through Mr. Reed’s

testimony, including that: (1) before defendant walked to the bathroom, she

confirmed that he would be watching the children, and (2) after defendant had

entered the bathroom he left Mercadiez unattended, did not in any way contradict

the evidence presented by the State during its case. Defendant’s evidence merely

clarified where Mr. Reed was in the house and what he was doing during the key

events leading up to Mercadiez’s death. Consequently, consideration of this evidence

is necessary in determining whether defendant’s motion to dismiss should have been

granted. See id. at 535, 308 S.E.2d at 262 (“We have consistently held that on a

motion to dismiss, the court must consider the defendant’s evidence which explains

or clarifies that offered by the State.”).

 - 18 -
 STATE V. REED

 Opinion of the Court

 Turning back to the relevant statute, North Carolina General Statute § 14-

318.2(a), while defendant was in the bathroom, her only affirmative act was to say,

“Can’t I [use the bathroom] in peace?” Defendant did not ask Mr. Reed to do anything,

much less request that he stop watching Mercadiez; rather, Mr. Reed unilaterally

decided to step in and remove the children from the bathroom while leaving

Mercadiez. It cannot be rationally inferred that defendant, simply by making this

statement, engaged in conduct that would subject her to criminal liability under

North Carolina General Statute § 14-318.2(a). See N.C. Gen. Stat. § 14-318.2(a).

Accordingly, defendant’s consistent evidence rebutted the inference raised by the

State’s evidence that she “create[d] or allow[ed] to be created a substantial risk of

physical injury[.]” Id.

 Thus, after reviewing the State’s evidence and defendant’s evidence that is not

in conflict therewith, we conclude that there was not substantial evidence that

defendant “create[d] or allow[ed] to be created a substantial risk of physical injury . .

. to [Mercadiez] by other than accidental means[.]” Id. Because an essential element

was missing from misdemeanor child abuse, see id., the trial court erred in denying

her motion to dismiss the charge. See Clark, 231 N.C. App. at 423, 752 S.E.2d at 711.

We thus vacate defendant’s conviction for misdemeanor child abuse.

2. Consideration of Only the State’s Evidence

 - 19 -
 STATE V. REED

 Opinion of the Court

 Although, as discussed above, defendant’s motion to dismiss should have been

granted upon consideration of both the State’s evidence and defendant’s evidence, the

motion should also have been granted even without consideration of defendant’s

evidence. The dissent takes the position that defendant’s evidence should not have

been considered, and that defendant’s motion should have been denied. We will

therefore address why we believe that even without consideration of defendant’s

evidence, the trial court still erred in denying defendant’s motion to dismiss the

charge of misdemeanor child abuse. Even assuming arguendo, that defendant’s

evidence did contradict the State’s evidence and thus should not be considered, see

generally Bates, 309 N.C. at 535, 308 S.E.2d at 262, the State still did not present

“substantial evidence . . . of each essential element of the offense charged[.]” Clark,

231 N.C. App. at 423, 752 S.E.2d at 711.4

 To determine what conduct may fall within the “by other than accidental

means” element of North Carolina General Statute § 14-318.2(a), we will examine

some cases which have found sufficient purposeful conduct pursuant to North

Carolina General Statute § 14-318.2(a). In State v. Fritsch, the Supreme Court

 4 We note that the dissent fails to address an element of each of the crimes at issue. As to
North Carolina General Statute § 14-318.2(a) it fails to address that the act must be “by other than
accidental means[.]” N.C. Gen. Stat. § 14-318.2(a). As to North Carolina General Statute § 14-316.1,
it includes only the first portion of the definition of neglect under North Carolina General Statute §
7B-101(15): “does not receive proper care, supervision, or discipline . . . . ” N.C. Gen. Stat. § 7B-101(15).
It omits the final phrase “from the juvenile’s parent[.]” The dissent concedes that Mr. Reed was
present at the house during the relevant time period but still considers his presence to be irrelevant.

 - 20 -
 STATE V. REED

 Opinion of the Court

determined there was sufficient evidence of misdemeanor child abuse, see 351 N.C.

373, 382, 526 S.E.2d 451, 457 (2000), where “the victim suffered from cerebral palsy

and severe mental retardation, functioning at the level of an infant[,]” and

 [o]n 4 October 1995 the DSS observed that the victim
 appeared emaciated; that her arms and legs were in a fetal
 position; that she looked and smelled bad; that she had
 crusted dirt between her toes and various folds of her skin;
 that her left foot was swollen; and that she had pressure
 sores on her right foot, right ear, back, and the back of her
 head at the hairline. When questioned about the victim’s
 physical condition, defendant responded that the pressure
 sores were actually ant bites that had not healed. The DSS
 then told defendant to take the victim to the doctor for a
 medical evaluation. On or about 19 October 1995, the
 victim was treated for an ear and upper respiratory
 infection; and the physical examination was rescheduled.
 However, defendant missed two scheduled appointments to
 have the victim physically examined. Despite numerous
 calls and visits to defendant’s home and a mailed certified
 letter requesting contact, the DSS was unable to contact
 defendant until 18 December 1995. On 19 December 1995
 the DSS stressed to defendant that the victim needed a
 physical evaluation and that she needed to be back at the
 Center. On 20 December 1995 the DSS substantiated
 neglect for lack of proper care and lack of proper medical
 care of the victim by defendant based on observations made
 at the Center on 4 October 1995 and defendant’s continued
 failure to take the victim to a doctor for a physical
 examination. The victim died on 1 January 1996 before
 case workers were scheduled to visit defendant’s home.
 On 2 January 1996 Dr. John Leonard Almeida, Jr.,
 a pathologist, performed an autopsy of the victim’s body.
 The autopsy revealed that the victim weighed eighteen
 pounds at her death and that the victim’s stomach
 contained approximately a quart of food. Dr. Almeida
 opined that the underlying cause of the victim’s death was
 starvation malnutrition.

 - 21 -
 STATE V. REED

 Opinion of the Court

Id. at 374-76, 526 S.E.2d at 451-54 (quotation marks omitted).

 In State v. Church, this Court found substantial uncontroverted evidence of

misdemeanor child abuse where

 Travis’ face was burned while he was under defendant’s
 supervision and no other adults were present . . . .
 Competent medical evidence at trial was that Travis’ facial
 burn was well-circumscribed, or perfectly round. The burn
 looked like the child’s face had been immersed in a bowl or
 cup of liquid. There were not any areas that looked as
 though there had been dripping, running, or motion.
 Instead, it appeared that something had been placed or
 held against the child’s face. The medical evidence also
 included an opinion that Travis suffered from battered
 child syndrome and an opinion that he had been abused.

99 N.C. App. 647, 654-55, 394 S.E.2d 468, 473 (1990).

 In State v. Woods, this Court concluded there was sufficient evidence that

“created or allowed to be created a substantial risk of physical injury, upon or to her

child by other than accidental means, in violation of the third distinct offense

described in G.S. 14–318.2(a)” where the evidence showed the “defendant’s husband

had repeatedly abused this child during the several weeks prior to 12 October, and

that the defendant was aware of this deplorable and dangerous situation but took no

effective action to stop or prevent the abuse until 12 October[,]” though defendant

was not actually charged with that offense, 70 N.C. App. 584, 587-88, 321 S.E.2d 4, 7

(1984) (brackets omitted). And in State v. Armistead, this Court determined that

though some evidence was erroneously admitted there was “ample uncontradicted

 - 22 -
 STATE V. REED

 Opinion of the Court

evidence” that the “defendant intentionally inflicted some physical injury on his child.

The force used was at least sufficient to draw blood and leave visible signs of the

injury for several days[,]” and thus defendant was properly convicted of misdemeanor

child abuse. 54 N.C. App. 358, 359-60, 283 S.E.2d 162, 164 (1981).

 In State v. Mapp, this Court determined there was sufficient evidence of

misdemeanor child abuse where

 [t]he evidence clearly shows that defendant was the
 mother of the child and the child was less than 16 years of
 age. Dr. Ronald Kinney, a physician with a specialization
 in treating abused children, testified for the State. The
 doctor stated that the deceased child was the victim of the
 battered child syndrome; that the term meant that the
 child had suffered nonaccidental injuries; and that the
 injuries were caused by the child’s custodian.

45 N.C. App. 574, 581-82, 264 S.E.2d 348, 354 (1980) (quotation marks omitted).

 Church, Woods, Armistead, and Mapp, all involved evidence of the purposeful

physical abuse of a child or at least knowing about such abuse and not taking action

to prevent or stop it; they have little in common with this case. See Church, 99 N.C.

App. at 655, 394 S.E.2d at 473; Woods, 70 N.C. App. at 587, 321 S.E.2d at 7;

Armistead, 54 N.C. App. at 360, 283 S.E.2d at 164; Mapp, 45 N.C. App. at 582, 264

S.E.2d at 354. Fristch is also distinguishable because it involved a child dying of

“starvation malnutrition” over the course of months of improper care against the

advice of DSS. 351 N.C. at 374-76, 526 S.E.2d at 452-54. While the defendant’s

conduct in Fristch, see id., may not rise to the level of intentionally beating a child, it

 - 23 -
 STATE V. REED

 Opinion of the Court

is certainly a form of purposeful, long-term abuse.

 Therefore, this case is most apposite to State v. Watkins, ___ N.C. App. ___, 785

S.E.2d 175 (2016). Because Watkins is the only precedential case that bears any

similarities to this case, we repeat the facts verbatim:

 At approximately 1:30 p.m. on 28 January 2014,
 Defendant drove with her 19–month–old son, James, to the
 Madison County Sheriff’s Office to leave money for Grady
 Dockery (“Dockery”), an inmate in the jail. The
 temperature at the time was 18 degrees, and it was windy
 with accompanying sleet and snow flurries.
 After parking her SUV, Defendant left James
 buckled into his car seat in the backseat of the vehicle and
 went into the Sheriff’s Office. While inside, Defendant got
 into an argument with employees in the front lobby.
 Detective John Clark (“Detective Clark”) was familiar with
 Defendant based on prior complaints that had been made
 about Defendant letting her toddler run loose in the lobby
 and into adjacent offices while she visited inmates in the
 jail. Detective Clark entered the lobby and told Defendant
 that by order of Chief Deputy Michael Garrison she was
 not supposed to be on the property and that she needed to
 leave.
 Defendant and Detective Clark argued for several
 seconds, and then he escorted her to her vehicle in the
 parking lot. Defendant was inside the building for at least
 six-and-a-half minutes. Detective Clark testified that from
 where Defendant was positioned in the lobby she could not
 see her vehicle, which was parked approximately 46 feet
 away from the front door.
 When Detective Clark was within 10 feet of
 Defendant’s vehicle, he noticed a small child sitting alone
 in the backseat. Defendant acknowledged that the child
 was hers. Detective Clark observed that the vehicle was
 not running and that the driver’s side rear window was
 rolled more than halfway down. He testified that it was
 very, very cold and windy and the snow was blowing. He

 - 24 -
 STATE V. REED

 Opinion of the Court

 stated that snow was blowing onto his head, making him
 so cold I wanted to get back inside. He noticed that the
 child, who appeared to be sleeping, had a scarf around his
 neck. Before walking back into the building, Detective
 Clark told Defendant to turn on the vehicle and get some
 heat on that child.

Id. at ___, 785 S.E.2d at 176 (quotation marks omitted).

 In Watkins, a jury convicted the defendant of misdemeanor child abuse, and

she appealed arguing the trial court should have allowed her motion to dismiss. See

id. at ___, 785 S.E.2d at 177. This Court’s opinion in Watkins focuses heavily on

whether there was a “substantial risk of physical injury[;]” but the ultimate

determination was that

 [g]iven the harsh weather conditions, James’ young age,
 and the danger of him being abducted (or of physical harm
 being inflicted upon him) due to the window being open
 more than halfway, we believe a reasonable juror could
 have found that Defendant created a substantial risk of
 physical injury to him by other than accidental means.

Id. at ___, 785 S.E.2d at 178.

 While foreseeability is not an element of misdemeanor child abuse, it is

difficult to engage in an analysis of when behavior crosses the line from “accident” to

“nonaccidental” without consideration of it; furthermore, an “accidental cause” is “not

foreseen[.]” Black’s Law Dictionary 15 (5th ed. 1979). In Watkins, the defendant was

aware of the harsh weather conditions, that the window was rolled down, and that

she was leaving her child unattended in a public space; in other words, defendant

 - 25 -
 STATE V. REED

 Opinion of the Court

engaged in the purposeful conduct of leaving her child in the circumstances just

enumerated; which is purposeful action that crosses the “accidental” threshold as

“physical injury” in this case is very foreseeable, whether by hypothermia or

abduction. Id. at ___, 785 S.E.2d at 178. From a commonsense standpoint, most, if

not all parents, know there are inherent and likely dangers in leaving a child entirely

alone in an open car in freezing weather in a public parking lot.

 Turning to this case, the State’s evidence never crossed the threshold from

“accidental” to “nonaccidental.”5 The known danger here was an outdoor pool. The

only purposeful action defendant took, even in the light most favorable to the State,

was that defendant went to the bathroom for five to ten minutes. In choosing to go

to the restroom, defendant did not leave her child in a circumstance that was likely

to create physical injury. This Court in Watkins deemed it to be “a close one,” but the

actions of the defendant in Watkins are far more active and purposeful in creating

the dangerous situation than defendant’s actions here. See id at ___, 785 S.E.2d at

178. If defendant’s conduct herein is considered enough to sustain a conviction for

misdemeanor child abuse, it seems that any parent who leaves a small child alone in

 5 The statistics cited by the dissent come from the CDC’s statistics labelled as “Unintentional
Drowning” and certainly they are disturbing; yet they are irrelevant to this case. (Emphasis added).
These “Unintentional Drownings” arise in many different types of situations, including some with
supervision by parents, lifeguards, or others. Most importantly, most “unintentional drownings”
would likely also be described as “accidental drownings,” and the issue here is whether the acts were
“by other than accidental means.” N.C. Gen. Stat. § 7B-101(15) (emphasis added).

 - 26 -
 STATE V. REED

 Opinion of the Court

her own home, for even a moment, could be prosecuted if the child is injured during

that time, not because the behavior she engaged in was negligent or different from

what all other parents typically do, but simply because theirs is the exceedingly rare

situation that resulted in a tragic accident.6 The State did not present substantial

evidence that defendant’s conduct caused injury to Mercadiez “by other than

accidental means[.]” N.C. Gen. Stat. § 14-318.2(a); see Clark, 231 N.C. App. at 423,

752 S.E.2d at 711 (“Substantial evidence is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.”). Therefore, the trial court

also erred in failing to allow defendant’s motion to dismiss the charge of misdemeanor

child abuse even without consideration of defendant’s evidence.

B. Contributing to the Delinquency of a Juvenile

 Defendant was also convicted of contributing to the delinquency of a juvenile

pursuant to North Carolina General Statute § 14-316.1. North Carolina General

Statute § 14-316.1 provides:

 Any person who is at least 16 years old who knowingly or
 willfully causes, encourages, or aids any juvenile within
 the jurisdiction of the court to be in a place or condition, or
 to commit an act whereby the juvenile could be adjudicated
 delinquent, undisciplined, abused, or neglected as defined
 by G.S. 7B-101 and G.S. 7B-1501 shall be guilty[.]

 6 We agree with the dissent that the State’s theory was that defendant, and only defendant,
failed to personally supervise Mercadiez, but the State failed to address one element of the crime, since
it failed to show that defendant also left Mercadiez without supervision from her other parent to prove
neglect under North Carolina General Statute § 7B-101(15). See N.C. Gen. Stat. § 7B-101(15).

 - 27 -
 STATE V. REED

 Opinion of the Court

N.C. Gen. Stat. § 14-316.1 (2013). Based on the facts of this case, the jury was

instructed only on the issue of neglect. North Carolina General Statute § 7B-101

defines a “[n]eglected juvenile” as one “who does not receive proper care, supervision,

or discipline from the juvenile’s parent[.]” N.C. Gen. Stat. § 7B-101(15) (2013).

 Thus, North Carolina General Statute § 14-316.1

 requires two different standards of proof. First, the State
 must show, beyond a reasonable doubt, that Defendant
 knowingly or willfully caused, encouraged, or aided the
 juvenile to be in a place or condition whereby the juvenile
 could be adjudicated neglected. Second, adjudication of
 neglect requires the State to show, by clear and convincing
 evidence, that a juvenile is neglected.

State v. Stevens, 228 N.C. App. 352, 356, 745 S.E.2d 64, 67, disc. review denied, 367

N.C. 256, 749 S.E.2d 886 (2013). Thus, we must consider whether defendant

“knowingly or willfully cause[d], encourage[d], or aid[ed the] juvenile . . . to be in a

place or condition, or to commit an act whereby the juvenile could be adjudicated[,]”

N.C. Gen. Stat. § 14-316.1, neglected, and under these facts the neglect alleged was

that Mercadiez did “not receive proper care, supervision, or discipline from the

juvenile’s parent[.]” N.C. Gen. Stat. § 7B-101(15).

 The flaw in the State’s case is that defendant was not the only “parent”

involved. Id. Essentially, the State’s theory at trial was that it did not matter that

Mr. Reed was present; in other words, the State’s theory hinges on the theory that

fathers are per se incompetent to care for young children. However, Mr. Reed was a

 - 28 -
 STATE V. REED

 Opinion of the Court

“parent[,]” and thus he had an equal duty to supervise and care for Mercadiez. Id.

The evidence does not show that defendant “knowingly or willfully” left Mercadiez “in

a place or condition[,]” N.C. Gen. Stat. § 14-316.1, where she would “not receive

proper care [or] supervision” from a “parent[.]” N.C. Gen. Stat. § 7B-101(15). There

is no evidence that defendant reasonably should have known that Mr. Reed was in

any way incompetent to supervise Mercadiez when she went to the bathroom.

 Furthermore and once again, even assuming arguendo that defendant’s direct

evidence of Mr. Reed’s express agreement to watch Mercadiez while defendant went

to the bathroom should not be considered, the State’s evidence alone supports an

inference that Mr. Reed was present and competent during the relevant time periods,

and thus the evidence still does not show that defendant “knowingly or willfully” left

Mercadiez “in a place or condition[,]” N.C. Gen. Stat. § 14-316.1, where she would

“not receive proper care [or] supervision” from a “parent[.]” N.C. Gen. Stat. § 7B-

101(15). Therefore, defendant’s motion to dismiss should have been granted. See

generally Clark, 231 N.C. App. at 423, 752 S.E.2d at 711.

 IV. Misuse of 404(b) Evidence

 Although we have already determined that defendant’s motions to dismiss

should have been granted, either with or without consideration of defendant’s

evidence, there are two other issues which defendant has raised on appeal and which

are addressed by the dissent: (1) the trial court erred in denying defendant’s motion

 - 29 -
 STATE V. REED

 Opinion of the Court

in limine to exclude the evidence of Sadie’s death because it was not an appropriate

use of evidence under North Carolina Rule of Evidence 404(b) regarding prior crimes

and bad acts and it should have been excluded pursuant to North Carolina Rule of

Evidence 403 because the probative value of the evidence did not substantially

outweigh the unfair prejudice, and (2) the State went so far beyond the scope of the

allowed purposes of the admitted 404(b) evidence in its arguments to the jury that it

amounted to plain error in defendant’s trial. Considering the extent of the evidence

regarding Sadie Gates’s death and the use of the evidence, we believe we should

address these issues as well. As noted below, evidence of Sadie’s death was stressed

as much or more than that of Mercadiez, and thus without substantive consideration

of that evidence by the jury, it is difficult to understand how the defendant was

convicted. For the reasons stated below, even if defendant did not prevail on the

motions to dismiss, she would be entitled to a new trial based on the misuse of the

evidence of Sadie’s death by the State.

 Before her trial began, defendant filed a motion to exclude the evidence

regarding the death of Sadie. The State argued that the evidence was proper under

North Carolina Rule of Evidence Rule 404(b). Rule 404(b) allows for the admission

of prior “crimes, wrongs, or acts” to show “as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake, entrapment or

accident.” N.C. Gen. Stat. § 8C-1, Rule 404(b) (2013). Ultimately, the trial court

 - 30 -
 STATE V. REED

 Opinion of the Court

found in its order that the evidence of Sadie’s death could be used solely as evidence

under Rule 404(b) because

 [t]here are sufficient similarities between the two events
 [Sadie’s and Mercadiez’s deaths] to support the State’s
 contention that the former incident is evidence that shows
 (1) knowledge on the part of the defendant of the dangers
 and possible consequences of failing to supervise a young
 child who has access to or is exposed to bodies of water; (2)
 absence of accident; and (3) explains the context of her
 statements at the scene and later to law enforcement.

(Emphasis added).

 [W]hen analyzing rulings applying Rules 404(b) and 403,
 we conduct distinct inquiries with different standards of
 review. When the trial court has made findings of fact and
 conclusions of law to support its 404(b) ruling, as it did
 here, we look to whether the evidence supports the findings
 and whether the findings support the conclusions. We
 review de novo the legal conclusion that the evidence is, or
 is not, within the coverage of Rule 404(b). We then review
 the trial court’s Rule 403 determination for abuse of
 discretion.

State v. Beckelheimer, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). The three

reasons enumerated by the trial court are proper reasons to allow in the evidence of

Sadie’s death pursuant to the plain language of Rule 404(b).7 See N.C. Gen. Stat. §

8C-1, Rule 404(b).

 7 While the jury instructions in this case were not raised as an issue on appeal, we will briefly
note the conflict within these instructions. In accordance with the Rule 404(b) order, the jury was
instructed they could not use the evidence regarding Sadie as substantive evidence, but that they could
use it for evidence of “absence of accident[.]” While the trial court did not err in the traditional sense
by instructing the jury pursuant to the language of Rule 404(b), in this particular case the language

 - 31 -
 STATE V. REED

 Opinion of the Court

 As to North Carolina Rule of Evidence 403, this rule precludes evidence unless

“its probative value is substantially outweighed by the danger of unfair prejudice[.]”

N.C. Gen. Stat. § 8C-1, Rule 403 (2013). “‘Unfair prejudice’ within its context [of Rule

403] means an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily, as an emotional one.” N.C. Gen. Stat. § 8C-1, Rule 403

Commentary (2013). It is difficult to fathom evidence more likely to lead to an

emotional decision than the death of a child; however, though this Court under de

novo review may have come to an alternate conclusion, as our review is abuse of

discretion, see Beckelheimer, 366 N.C. at 130, 726 S.E.2d at 159, we cannot say that

“the trial court’s ruling is so arbitrary that it could not have been the result of a

reasoned decision.” Chicora Country Club, Inc. v. Town of Erwin, 128 N.C. App. 101,

109, 493 S.E.2d 797, 802 (1997) (citation and quotation marks omitted). Therefore,

the trial court did not err in allowing in the evidence regarding Sadie’s death.

 But that does not end our analysis. Defendant also argues that the State went

so far beyond the scope of the proper use of the admitted 404(b) evidence in its

of Rule 404(b) mirrored the element of misdemeanor child abuse which was most highly contested —
“by other than accidental means” — which was an element the jury must find to convict defendant of
misdemeanor child abuse. N.C. Gen. Stat. § 14-318.2(a). Thus the instructions told the jury that they
could use the evidence of Sadie’s death to show “absence of accident[,]” but the jury was also instructed
that the evidence could not be used for the elements which included “by other than accidental means[.]”
Id. The confusion arises because typically, the 404(b) evidence is used to show that the defendant
acted intentionally, but here, the State was not seeking to show that defendant intentionally killed
Mercadiez. There is no way that the jury could have understood this fine legal distinction between
“absence of accident” and “by other than accidental means.” Id. But the jury instructions were not
raised or argued as an issue on appeal so we do not address it, other than noting how it compounded
the problems with the use of the evidence of Sadie’s death.

 - 32 -
 STATE V. REED

 Opinion of the Court

arguments to the jury that it amounted to plain error in defendant’s trial. Because

defendant’s argument hinges on the admission of evidence during the trial, it is

appropriate for plain error review. See State v. Wolfe, 157 N.C. App. 22, 33, 577

S.E.2d 655, 663 (“[T]he plain error doctrine is limited to errors in jury instructions

and the admission of evidence.”), appeal dismissed and disc. review denied, 357 N.C.

255, 583 S.E.2d 289 (2003).

 For error to constitute plain error, a defendant must
 demonstrate that a fundamental error occurred at trial. To
 show that an error was fundamental, a defendant must
 establish prejudice that, after examination of the entire
 record, the error had a probable impact on the jury’s
 finding that the defendant was guilty. Moreover, because
 plain error is to be applied cautiously and only in the
 exceptional case, the error will often be one that seriously
 affects the fairness, integrity or public reputation of
 judicial proceedings.

State v. Sessoms, 226 N.C. App. 381, 382, 741 S.E.2d 449, 451 (2013) (ciation omitted).

 After a thorough review of the transcript, we believe that the State used the

evidence of Sadie’s death far beyond the bounds allowed by the trial court’s order. By

our count, the State mentioned Sadie to the jury by name 12 times in its opening; by

comparison, Mercadiez, the actual child this case was about, was mentioned 15. Even

more concerning, during the State’s direct examination Mercadiez is mentioned 33

times, while Sadie is mentioned 28.8 Lastly, during closing, the State mentions

 8 If we include all references in questioning or testimony during the State’s case in chief by
both the State and defendant rebutting the State’s inferences, Sadie was mentioned 32 times and
Mercadiez 45 times.

 - 33 -
 STATE V. REED

 Opinion of the Court

Mercadiez 15 times to the jury and Sadie 12 times, with the State asserting that the

“bottom line” hinged on Sadie:

 So the bottom line is this. It does not matter how
 she got into the pool. She got into the pool and drowned,
 and the defendant, Amanda Reed, was not watching her.
 She failed to supervise her and ensure her safety. She
 failed to supervise her daughter, just like she failed to
 supervise Sadie Gates.

(Emphasis added.)

 Turning solely to the legal questions before us, here, the State mentioned Sadie

Gates almost as many times to the jury as the child who had actually died in this

case. While Mercadiez was often being discussed by pronouns -- as was Sadie, for

that matter -- and we have not counted those, it is clear what the jury must have

gathered from hearing Sadie’s name more than 52 times, as compared to 63 for

Mercadiez, only to finally be left with Sadie’s tragic death as their “bottom line[.]”

The State’s use of the evidence regarding Sadie went far beyond showing that

defendant was aware of the dangers of water to small children or any other proper

purpose as found by the trial court. This case is the “exceptional case” where “a

fundamental error occurred at trial” establishing “prejudice that, after examination

of the entire record . . . had a probable impact on the jury’s finding that the defendant

was guilty” and “seriously affect[ed] the fairness” of this case. Id. Therefore, on this

issue, defendant would be entitled to a new trial, but as noted above, we have reversed

defendant’s convictions based upon her motions to dismiss.

 - 34 -
 STATE V. REED

 Opinion of the Court

 We are not, as the dissent suggests, relying solely upon the number of

references to Sadie, nor are we taking a single statement out of context. The State

repeatedly suggested that the jury rely improperly upon Sadie’s death to find

defendant guilty. Here are some other examples:

 Had the defendant not been responsible for Sadie
 Gates’s death, had she not been warned of the dangers of
 leaving a child unsupervised by Julie Dorn, then you would
 not be sitting here today, deciding this case. Will Reed can
 come in here and try to take the blame, and they can try to
 put it on a sibling. They can talk about how good a parent
 Amanda Reed is, and they can show all the appropriate
 emotions and responses for a parent that has lost a child,
 but she cannot avoid responsibility any longer. She cannot
 continue to shift the blame. It did happen again. Another
 child left under her care and her supervision, another child
 that drowned and died.
 ....
 . . . Two children, two, under her care, left unsupervised by
 her, who got out of the house and into the water and
 drowned. Her inactions, her lack of supervision, without
 question, demonstrate a grossly negligent omission. Sadie
 Lavina Gates, born 2/23/2009. Date of death: 9/27/2010.
 Cause of death: drowning. Place of injury: pond. Location:
 3390 Burgaw Highway. Sadie Gates.
 Mercadiez Kohlinda Reed, born 9/14/2011. Date of
 death: 5/11/2013. Cause of death: drowning. Place of
 injury: residence. Location: 313 Forest Grove Avenue,
 Jacksonville.
 ....
 . . . Two children, the same age, both girls, left
 unsupervised, out of the house, drowned in water. You
 know what the common denominator is that everyone has
 overlooked, what’s not on either one of those death
 certificates right there in front of you? What’s the common
 denominator? Her. Amanda Reed is the common
 denominator. She is the one. And just as she was

 - 35 -
 STATE V. REED

 Opinion of the Court

 responsible for the death of Sadie Gates, so, too, is she
 responsible for the death of Mercadiez Reed. Not a sibling,
 not Will Reed, but her. She is the person that can and
 should be held criminally responsible for her daughter’s
 death, because she is the only person who knew of the
 dangers, who had been negligent before, and who acted in
 a grossly negligent manner.
 ....
 In the beginning, I told you there were six questions:
 who? What? Where? When? How and why? I want to
 talk about the one question [defendant’s counsel] didn't
 talk about. Why. Isn't that what the case is all about?
 Why? You know why. You know why. Sadie Gates’s death
 was caused by the defendant’s lack of supervision and care.
 Mercadiez Reed’s death was caused by the same lack of
 supervision and care.

(Emphasis added.)

 We have considered the totality of the evidence and arguments, and the specter

of Sadie’s death permeated the entirety of the State’s case-in-chief. Although some

portions of the State’s argument were, as noted by the dissent, within the proper

scope of use of the evidence, others, as we have cited above, were not. By referencing

only the portions of the State’s argument that stayed within the Rule 404(b) bounds,

the dissent takes the use of the evidence out of context. Considering the argument

as a whole, the prosecution clearly used the evidence of Sadie’s death far beyond the

purposes for which the trial court admitted the evidence and essentially argued that

defendant has a propensity to leave two-year-old girls unattended, resulting in death

by drowning; this is the use forbidden by Rule 404(b). See N.C. Gen. Stat. § 8C-1,

Rule 404(b).

 - 36 -
 STATE V. REED

 Opinion of the Court

 V. Conclusion

 In certain cases, “we must bear in mind Lord Campbell’s caution: ‘Hard cases

must not make bad law.’” Hackos v. Goodman, Allen & Filetti, PLLC, 228 N.C. App.

33, 43, 745 S.E.2d 336, 343 (2013) (citation and quotation marks omitted). Here, the

death of Mercadiez was tragic, as was Sadie’s death, but the law does not support the

charges against defendant with an appropriate consideration of the actual evidence

in this case. The trial court erred in denying defendant’s motion to dismiss both

charges, and defendant’s convictions are vacated.

 VACATED.

 Judge DAVIS concurs with separate opinion.

 Judge STEPHENS dissents.

 - 37 -
No. 15-363 – State v. Reed

 DAVIS, Judge, concurring.

 I concur in the result reached by the majority and in the bulk of its analysis.

However, I write separately to note the areas of the majority’s opinion as to which I

disagree.

 With regard to the trial court’s denial of Defendant’s motion to dismiss at the

close of the evidence, I agree with the majority that because the evidence introduced

during Defendant’s case-in-chief did not in any way contradict the State’s evidence,

the trial court was required to consider Defendant’s evidence in ruling on the motion

to dismiss. For the reasons discussed by the majority, this evidence establishes that

Defendant did not leave Mercadiez without adult supervision for the limited time

period during which Defendant was not personally supervising Mercadiez because

she had left to use the bathroom.

 However, I do not join the majority’s alternative analysis in which it

determines that even if Defendant’s evidence is not considered, Defendant would still

be entitled to have her convictions vacated. To the contrary, I agree with the dissent

that based exclusively on the State’s evidence, the denial of Defendant’s motions to

dismiss would have been proper.

 Furthermore, I part company with the majority on the appropriate definition

of the phrase “by other than accidental means” in N.C. Gen. Stat. §14-318.2(a). In

my view, the manner in which the majority interprets this phrase would prevent a
 STATE V. REED

 DAVIS, J., Concurring

defendant from ever being convicted of N.C. Gen. Stat. §14-318.2(a) on a theory of

negligence, a result that cannot be squared with the plain language of this statutory

provision or with our Court’s recent decision in State v. Watkins, __ N.C. App. __, 785

S.E.2d 175 (2016).

 Finally, while the issue is technically moot in light of our holding that

Defendant’s convictions must be vacated, I also agree with the section of the

majority’s analysis addressing whether — in the absence of our decision to vacate her

convictions — Defendant would be entitled to a new trial due to the extent to which

the State’s arguments improperly focused on Sadie’s death. Even assuming arguendo

that the trial court did not err in deeming evidence of Sadie’s death admissible

pursuant to Rule 404(b) and not unduly prejudicial under the balancing test of Rule

403, this evidence was admitted for limited purposes by the trial court. However, in

my view, the manner in which the Rule 404(b) evidence was actually used by the

State in its arguments grossly exceeded these limited purposes for which the evidence

was originally admitted. As the majority’s analysis explains, it is difficult — if not

impossible — to read the transcript and conclude that Defendant received a fair trial.

 2
 No. COA15-363 – State v. Reed

 STEPHENS, Judge, dissenting.

 Applying our well-established standard of review to the trial court’s denial of

defendant’s motion to dismiss, I conclude that the State offered sufficient evidence of

defendant’s failure to properly supervise Mercadiez to submit the case to the jury.

Further, I would find no error in the admission of Rule 404(b) evidence or in the trial

court’s failure to intervene ex mero motu in the State’s closing argument. For the

reasons discussed below, I would hold that defendant received a trial free from error.

Accordingly, I respectfully dissent.

I. Relationship between the State’s and the defense’s evidence on supervision

 I agree with the majority opinion that, in ruling on a defendant’s motion to

dismiss, the “defendant’s evidence may be considered on a motion to dismiss where it

clarifies and is not contradictory to the State’s evidence or where it rebuts permissible

inferences raised by the State’s evidence and is not contradictory to it.” State v. Reese,

319 N.C. 110, 138-39, 353 S.E.2d 352, 368 (1987) (citations omitted; emphasis added),

overruled on other grounds by State v. Barnes, 345 N.C. 184, 481 S.E.2d 44 (1997); see

also State v. Barnett, 141 N.C. App. 378, 382-83, 540 S.E.2d 423, 427 (2000) (holding

that “the trial court is not to consider [a] defendant’s evidence rebutting the inference

of guilt except to the extent that it explains, clarifies or is not inconsistent with the

State’s evidence”) (citation and internal quotation marks omitted), affirmed per

curiam, 354 N.C. 350, 554 S.E.2d 644 (2001). I reach a different result from the
 STATE V. REED

 STEPHENS, J., dissenting.

majority because, in my view, defendant’s evidence regarding the events immediately

before Mercadiez drowned was contradictory to the State’s evidence on the same

point.

 The majority opinion notes that, “[w]hile the State’s case did not emphasize

the fact that Mr. Reed was also home with defendant at the time of Mercadiez’s

drowning, the evidence the State offered did indicate that he was at the house during

the relevant period of time.” I fully agree.9 The uncontradicted evidence was that

Mr. Reed was in the home at the time of Mercadiez’s drowning, just as the

uncontradicted evidence was that defendant herself was also in the home at the time.

The critical issue regarding defendant’s criminal responsibility for the death of her

daughter, however, is not what adults were in the home at the time Mercadiez found

her way into the pool, but rather, what adult, if any, was supervising Mercadiez. On

that critical issue, the State’s evidence showed that defendant left her 19-month-old

baby in the care of nine-year-old Sarah. I simply do not agree with the majority’s

assertion that the acknowledged presence of Mr. Reed somewhere inside a multi-room

house, without any evidence that he could hear or see Mercadiez as she played outside

on the side porch with other children, was in any way relevant to the question of who

was supervising Mercadiez when she wandered away to her death. The majority

9I disagree, however, with the majority’s apparent assertion that the only way to establish a conflict
between the State’s evidence and defendant’s evidence would have been for the State to offer evidence
placing Mr. Reed in a different location inside the house from the location Mr. Reed described.

 2
 STATE V. REED

 STEPHENS, J., dissenting.

further contends that Mr. Reed’s testimony for the defense—that he was in the living

room when defendant went to the bathroom and that defendant specifically asked him

to supervise Mercadiez—was not inconsistent with, and merely clarified, the State’s

evidence. A careful reading of the trial transcript belies this characterization of the

evidence presented by the State and the defense.

 The only evidence offered by the State about what happened in the minutes

leading up to the drowning came from Sergeant Michael Kellum of the Jacksonville

Police Department (“JPD”). After testifying in detail about the Reeds’ home and its

appearance after Mercadiez’s death, Kellum briefly discussed the interview he

conducted with defendant.

 Q Did you ask [defendant] to explain to you what she
 had been doing in the moments leading up to this incident?

 A Yes, sir.

 Q What did she tell you?

 A That she was in the bathroom.

 Q Did she tell you how long she had been in the
 bathroom?

 A Yes. She estimated, I believe, it was five to ten
 minutes.

 [discussion of which bathroom defendant used]

 Q What happened then, or what did she explain to you
 happened then?

 3
 STATE V. REED

 STEPHENS, J., dissenting.

A She said that she came out of the bathroom and she
saw the oldest daughter, or the older daughter, playing in
that—or in the house, and she had earlier seen the infant,
Mercadiez, with—playing with the older daughter. So she
asked the older daughter where Mercadiez was, and she—
the daughter indicated that she had brought her inside and
put her inside the living room, earlier. And she—according
to her interview, she immediately started looking for the
child, inside the house, going room to room, trying to find
the house—or trying to find the child, and then went out
the front door and around the house, trying to find the
child, until she went out the master bedroom door
overlooking the pool, and saw the baby floating in the pool.

[discussion of how Mercadiez was retrieved from the pool
and 911 was called]

Q You said she indicated that she had been in the
bathroom for five to ten minutes.

A Yes, sir.

Q Did you ask her about that?

A No. She provided that, previously. During the
interview, she had provided that she had begun
menstruating and was—that’s why she was in the
bathroom.

[discussion of the time defendant spent in the bathroom]

Q Okay. And I guess she acknowledged to you that
Mercadiez was not with her, at that time?

A That’s correct.

Q And based on what [defendant]—did [defendant]
explain to you where Mercadiez was, at that time?

 4
 STATE V. REED

 STEPHENS, J., dissenting.

 A She had—when she went into the bathroom, she had
 seen Mercadiez playing on the side concrete porch by the
 side door, with the other girls, that being [Sarah] and
 [Sarah’s] friends from down the street.

 Q And those are minors,10 as well, right?

 A Yes, sir.

 Q Did she acknowledge to you that [Sarah] told her
 when she brought Mercadiez back into the house?

 A She—once she came out of the bathroom and asked
 [Sarah] what—she saw [Sarah] without Mercadiez, asked
 [Sarah] where Mercadiez was. [Sarah] said she had put
 her in the living room.

In sum, on direct examination, the State’s evidence was that: (1) Mercadiez was

playing outside with Sarah and other children when (2) defendant went to the

bathroom where (3) she remained for five to ten minutes because she was

menstruating and, when she came out of the bathroom, (4) defendant encountered

Sarah inside the house without Mercadiez and (5) asked Sarah where her youngest

sister was.11 Kellum did not offer any testimony about what Mr. Reed was doing,

10 Sarah was nine years old at the time.

11This account of his interview with defendant is substantially similar to Kellum’s testimony at a
pretrial hearing on the admission of Rule 404(b) evidence:

 Q And based on your conversations with [defendant], what was
 your understanding about where [defendant] was and what she was
 doing immediately prior to this incident?

 A She indicated that she was in the bathroom and that a couple
 of the girls were—some of the other kids in the house were trying to

 5
 STATE V. REED

 STEPHENS, J., dissenting.

where he was in the house, or whether defendant asked him to watch Mercadiez when

she went to the bathroom.

 On cross-examination of Kellum, defendant had the opportunity to clarify the

critical question of what happened in the moments before defendant went to the

bathroom. However, defendant’s trial counsel did not ask Kellum whether defendant

mentioned asking her husband to watch Mercadiez when she went to the bathroom

nor did he ask whether Mr. Reed mentioned being asked to watch Mercadiez during

Mr. Reed’s interview with Kellum. Defendant’s trial counsel did not even ask

whether Mr. Reed or defendant had mentioned Mr. Reed’s presence in the living room

at the time defendant went to the bathroom.12 Indeed, the only questions defense

 talk to her through the bathroom door. She came—once she came out
 of the bathroom, she indicated that she saw [Sarah], which was one of
 the other children in the house, and that was when they realized
 [Mercadiez] was missing. She asked [Sarah] where the child was, and
 then the search began to find the child.

12 I find the majority opinion’s characterization of the direct examination of Kellum as “the State’s
strategic decision to forego calling as a witness the only adult in the house during the relevant time
period other than defendant[,]” an unsupported assumption regarding the prosecution’s motive.
Certainly, the State was focused on proving its case against defendant, but it is equally as reasonable
to assume that the prosecutor (and Kellum) were likely very surprised that defendant’s trial counsel
elected not to ask Kellum on cross-examination whether, during Kellum’s interviews with the Reeds,
defendant or Mr. Reed mentioned that defendant asked Mr. Reed to watch Mercadiez when defendant
went to the bathroom. The failure of defense counsel to undertake this line of inquiry is difficult to
understand in that, at a pretrial hearing regarding the admissibility of Rule 404(b) evidence,
defendant’s trial counsel cross-examined Kellum about the interview and Kellum testified:
 According to her statement that she made on the day she was
 interviewed in the office, she indicated to [Mr. Reed] that she needed
 to use the restroom; her stomach was bothering her and she was
 beginning her menstrual cycle. She went to the bathroom, . . . which
 is near the den/kitchen area. She said that the kids . . . began talking
 to her through the door, and [Mr. Reed] shooed them away from the

 6
 STATE V. REED

 STEPHENS, J., dissenting.

counsel asked about Kellum’s interviews with defendant and Mr. Reed sought to

clarify how Mercadiez got outside onto the side porch:

 Q Well, as you remember this interview, did
 [defendant and Mr. Reed] tell you the same thing about
 what happened that day?

 A Yes, sir.

 [discussion of when the interviews took place]

 Q And in response to some of [the prosecutor’s]
 questions, you indicated that their belief was that the child
 went from the side porch, through the locked gate.

 A Yes, sir.

 door back to their rooms. When she walked out of the bathroom, she
 saw [Sarah] in the kitchen and asked where the daughter was, or
 where [Mercadiez] was, and [Sarah] indicated that she had brought
 [Mercadiez] into the house 15 minutes prior.

At the same hearing, Kellum described his interview with Mr. Reed on cross-examination as follows:

 Q You interviewed Mr. Reed the night of this incident at the
 hospital, correct?

 A I did.

 Q Mr. Reed, would you say, told you the same or consistent story
 regarding his whereabouts that day, where the child was on the night
 of the accident, as he did three days later?

 A Yes, sir. It was quite a bit more limited due to his obvious grief,
 but, yes, there were little or no inconsistencies.

 Q And Mr. Reed also indicated that [defendant] left the child with
 him in the living room when she went to the bathroom, right?

 A He indicated she used the bathroom.

Of course, none of this testimony from the pretrial hearing was evidence at trial, and thus, it was not
part of the trial court’s consideration when ruling on defendant’s motion to dismiss.

 7
 STATE V. REED

 STEPHENS, J., dissenting.

Q And that the child had been out there with her older
sister, [Sarah].

A Yes, sir.

[discussion of the ages of the other children in the home that
day]

Q Okay. Do you remember how they told you
Mercadiez got outside?

A That she had—[Sarah] was playing with them and
had taken her outside, I believe.

[discussion of the layout of the Reeds’ home]

Q During your interview with Mr. Reed, you discussed
how Mercadiez got outside.

A We discussed the movements of the family that day,
yes, sir.

Q Okay. And per your recollection, what did he tell you
about that?

[THE STATE]: Objection.

THE COURT: Sustained.

Q You talked to [defendant] about it.

A About the movements of the children during the
day? Yes, sir.

Q Did she give you any indication of how the child got
outside?

A No, sir, not that I recall. The children were in and
out, playing, all during the day. . . .

 8
 STATE V. REED

 STEPHENS, J., dissenting.

I am not, as the majority opinion suggests, “arguing that defense counsel was

required to cross-examine . . . Kellum about Mr. Reed’s role in these events.”

(Emphasis added). I am simply observing that the State presented its version of the

events leading up to Mercadiez’s drowning, and I fully agree with the majority’s

observation that, in doing so, “the State chose to rely solely upon . . . Kellum and not

to call Mr. Reed as a witness.” Defendant had no duty whatsoever to cross-examine

Kellum on any point unless she wished to elicit evidence contradictory to the State’s

version of how Mercadiez came to be unsupervised and find her way tragically into

the backyard pool. To recap, the State’s evidence about the critical minutes before

the drowning was that defendant reported leaving Mercadiez outside on the side

porch with Mercadiez’s nine-year-old sister, Sarah, while defendant went to the

bathroom for five to ten minutes. In addition, Kellum testified that defendant told

him she realized Mercadiez was missing when she saw Sarah inside without the

toddler and that defendant immediately asked Sarah where Mercadiez was.

According to Kellum’s account of the interview, defendant did not mention asking Mr.

Reed to watch Mercadiez, seeing Mr. Reed when she left the bathroom, or asking Mr.

Reed where Mercadiez was, as might be expected if defendant had left Mercadiez in

Mr. Reed’s care. Therefore, I reject defendant’s argument that the State offered no

evidence of a lack of supervision by defendant.

 9
 STATE V. REED

 STEPHENS, J., dissenting.

 Mr. Reed was the only witness to testify for the defense, and, as noted supra,

his testimony “may be considered . . . [only] where it clarifies and is not contradictory

to the State’s evidence or where it rebuts permissible inferences raised by the State’s

evidence and is not contradictory to it.” See Reese, 319 N.C. at 139, 353 S.E.2d at 368

(citations omitted; emphasis added). Mr. Reed’s account of the events during the

critical time period was as follows:

 A . . . I went back over here and continuously, you
 know, helped her with the laundry, and then I went out
 and sat down on the—once the laundry was done, I sat on
 the couch—well, when she was finishing up, I sat on the
 couch.

 ....

 Q From there, you could see out the door [onto the side
 porch]?

 A From there, you can see out the door.

 Q Did you see Mercadiez?

 A Yes.

 Q You had your eye on her from sitting right there?

 A Yep.

 Q And after you sat down, tell me what happened from
 there.

 A I sat down from there, and that’s when [defendant]
 said, you know, I have to use the bathroom, you got this?
 And I said, yes.

 10
 STATE V. REED

 STEPHENS, J., dissenting.

Q You got this?

A You got this.

Q What does that mean?

A To me, it means you got what’s going on in the house,
everything that’s going on.

Q Referring to the children?

A Referring to the children, whatever.

Q And [defendant] left?

A To go use the bathroom, yes.

[discussion of which bathroom defendant was using]

Q Tell me what happened, from there.

A Like anything, I was sitting there. I said, yes. She
left to go to the bathroom. I was sitting—not even a couple
minutes later, I mean, I heard—

[discussion of why defendant was going to the bathroom]

Q And I’m sorry, I just wanted—if you will, so she goes
to the bathroom.

A Right. While she was in the bathroom, like
anything, and then I was sitting over here, and Mercadiez
is up front in the yard with—the side porch with [Sarah], I
heard, “Can’t I [use the bathroom] in peace?”

Q And that was [defendant]?

A That was [defendant], yes.

Q What was that about?

 11
 STATE V. REED

 STEPHENS, J., dissenting.

A While she was in the bathroom, the two younger
[children were] in there, bothering her. And from there,
like anything, I mean, just when I heard that, I got up.
When I was walking by, walking by this area right here, I
got up, walked around, was walking right through here,
that’s when I looked over to the front door, which is this
way, and I saw Mercadiez sitting down on the porch with
[Sarah], playing in the flower—the flower pot that was in
the picture, she was playing in the flower pot.

Q Where did you go from there?

A I went into the—the bathroom where she was
located, where [defendant] was located, and grabbed the
two girls from there.

[discussion of which two girls were bothering defendant]

Q And at that point, [defendant] was sitting on the
toilet?

A Yes, she was sitting on the toilet.

Q And what did you do with those two little girls?

[discussion of Mr. Reed setting up a movie for the two girls]

A I checked on [another child], and then I walked back
up through the hallway. When I was walking up through
the hallway, [defendant] got done using the bathroom and
came out.

Q So you essentially met her in the hallway?

A Met her in the hallway, yes.

Q She’s in front of you. Which way did she go?

 12
 STATE V. REED

 STEPHENS, J., dissenting.

 A She went through the—through the hallway, into
 the kitchen.

 [discussion of how close defendant and Mr. Reed were in the
 hallway]

 A When I got into the kitchen, like anything, well, she
 walked up, and she walked towards the middle of the
 counter right there, by the middle of the counter, and then
 [Sarah] walked in. And when [Sarah] walked in, the first
 thing [defendant] said is, “where is Mercadiez?”

Thus, Mr. Reed’s account was that (1) he was with defendant in the living room

already supervising Mercadiez when defendant announced that she was going to the

bathroom and asked Mr. Reed to watch the toddler; (2) he heard defendant call out

in frustration because two other children were in the bathroom bothering her; (3) he

left the living room for several minutes to settle the other children in front of a movie;

and (4) he met defendant in the hallway as she left the bathroom.13 Mr. Reed’s

version of events is plainly not consistent with the State’s evidence that defendant

left Mercadiez outside on the side porch with Sarah while defendant went to the

bathroom for five to ten minutes and that, when defendant returned to the living

room, she was surprised to encounter Sarah inside without Mercadiez. Accordingly,

in considering the merits of defendant’s motion to dismiss for insufficiency of the

13 This is the “actual evidence from defendant’s case[,]” as quoted above and summarized here, that, in
my view, “contradicts the State’s evidence[,]” quoted at length and summarized on the third through
sixth pages of this dissent. (Emphasis added).

 13
 STATE V. REED

 STEPHENS, J., dissenting.

evidence, neither the trial court nor this Court should consider Mr. Reed’s testimony

regarding the events immediately preceding the drowning.

 I find State v. Bates, 309 N.C. 528, 308 S.E.2d 258 (1983), the primary case

relied upon in the majority opinion, easily distinguishable. The defendant in Bates,

having been convicted of felony murder and robbery with a dangerous weapon as a

result of an admitted altercation with another man, argued on appeal that “the trial

court erred in denying his motion to dismiss the armed robbery charge[, which was

also the predicate felony supporting his felony murder conviction] for insufficiency of

the evidence.” Id. at 533, 308 S.E.2d at 262. “Specifically, [the] defendant argue[d]

that the State ha[d] not shown by substantial evidence a taking of the victim’s

property with the intent to permanently deprive him of its use.” Id. at 534, 308 S.E.2d

at 262. As noted in the majority opinion, the State’s evidence concerned the scene of

the crime, including the condition of the victim’s and the defendant’s bodies, and the

location of the victim’s and the defendant’s personal possessions. Id. at 534-35, 308

S.E.2d at 262-63. There were no witnesses to the fight, but the defendant testified

about the events which led up to the altercation and his account of how the victim

was killed. Id. at 535, 308 S.E.2d at 263. Importantly, both the “[d]efendant’s

testimony and the physical evidence reveal[ed] that a brutal fight took place between”

the defendant and victim. Id. On the only point of dispute—whether the defendant

had robbed the victim—“[t]he State relie[d solely] on the fact that the deceased’s

 14
 STATE V. REED

 STEPHENS, J., dissenting.

property was found some distance from his body to establish a taking by [the]

defendant[,]” while the “[d]efendant testified that he never saw [the victim’s]

possessions nor was he aware of how they came to be strewn around the area.” Id. at

534, 535, 308 S.E.2d at 262, 263. Our Supreme Court, in holding the evidence was

insufficient to survive the defendant’s motion to dismiss, observed that, “[w]hen [the]

defendant’s explanatory testimony is considered along with the physical evidence

presented by the State, the logical inference is that the [victim] lost these items of

personal property during the struggle with [the] defendant.” Id. at 535, 308 S.E.2d

at 263. In other words, there were not two possible accounts of the crime presented.

Instead, the State’s evidence was entirely a description of the physical crime scene—

the “what” of the altercation—while the defendant’s evidence concerned the “how”

and “why” of the fight. The State’s evidence would have supported an inference of

robbery, but the defendant’s evidence provided an explanation that rebutted the

inference of robbery by permitting an innocent inference from the State’s crime scene

evidence.

 Here, in contrast, the State and defendant each presented a distinct “story” of

how Mercadiez came to be unsupervised such that she could wander away and drown.

The State’s evidence was that defendant was watching Mercadiez play outside on the

side porch with her sister when defendant left the living room and spent several

minutes in the bathroom where she could not supervise Mercadiez and that the

 15
 STATE V. REED

 STEPHENS, J., dissenting.

toddler was not with her older sister when defendant returned from the bathroom.

Defendant’s evidence was that her husband was already watching Mercadiez when

defendant asked him to supervise the toddler while she went to the bathroom for

several minutes only to find Mercadiez missing when defendant and her husband

both returned to the living room.14 Unlike in Bates, the question here is not whether

an inference permitted by the State’s evidence is rebutted by the clarifying evidence

of the defendant which supports a more likely inference. It is whether the jury

believed the State’s theory of the case, to wit, that defendant left Mercadiez

unsupervised when she went to the bathroom, or whether they believed defendant’s

account that she left her child in the care of her husband. Simply put, both versions

of the moments before the tragic drowning cannot be true. Thus, the State’s evidence

is inconsistent with defendant’s evidence and could not be considered by the trial

court or by this Court in evaluating the sufficiency of the evidence against defendant.

See Reese, 319 N.C. at 139, 353 S.E.2d at 368 (stating that a defendant’s evidence

“may be considered . . . [only] where it clarifies and is not contradictory to the State’s

evidence or where it rebuts permissible inferences raised by the State’s evidence and

is not contradictory to it” (citations omitted; emphasis added)). However, in order to

fully address defendant’s argument that the trial court erred in denying her motion

14 In my opinion, these contrasts between the State’s and defendant’s evidence are a “coherent
argument [about] why Mr. Reed’s testimony should be disregarded.”

 16
 STATE V. REED

 STEPHENS, J., dissenting.

to dismiss, her contentions that the trial court erred in admitting certain Rule 404(b)

evidence must also be considered.

II. Admission of Rule 404(b) evidence

 I agree with the ultimate determination in the majority opinion that the trial

court did not err in admitting, pursuant to Rules 403 and 404(b) of the North Carolina

Rules of Evidence, evidence regarding the previous drowning of another toddler left

in defendant’s care. However, because a more thorough discussion of the evidence

and the basis for its admission is helpful in understanding why (1) defendant’s motion

to dismiss was properly denied and (2) the trial court did not err in failing to intervene

ex mero motu in the State’s closing argument, I write separately on this issue.

 As noted by the majority, during the investigation of Mercadiez’s death, JPD

officers learned about the 22 September 2010 death of 19-month-old Sadie Gates, who

had wandered away and drowned in a rain-filled creek while in defendant’s care.

Defendant was convicted of involuntary manslaughter in connection with that

incident and was still on probation at the time of Mercadiez’s death. In addition,

investigators received a report from a neighbor of the Reeds regarding an incident

that occurred about a month before Mercadiez’s death. The neighbor had been

driving past the Reeds’ home and noticed two children, one a toddler and the other

about three or four years old, playing at the edge of the curb next to the street.

Concerned for the children’s safety, the neighbor stopped her car and knocked on

 17
 STATE V. REED

 STEPHENS, J., dissenting.

defendant’s door, which was answered by a five- or six-year-old child. When

defendant eventually came to the door, the neighbor pointed out the unsupervised

young children in the yard, and defendant went to retrieve them.

 In June 2014, the State filed a motion in limine regarding the admissibility of

the neighbor’s report of unsupervised young children in defendant’s yard and the

2010 drowning of Sadie Gates. In July 2014, defendant filed her own motion in

limine, arguing that the admission of evidence of those events was barred by Rule

404(b). Following a hearing, on 23 September 2014, the trial court entered an order

denying defendant’s motion in limine to exclude evidence of the 2010 drowning. The

court deferred ruling on the admissibility of the neighbor’s testimony until trial,

ultimately allowing the neighbor to testify about the unsupervised children seen in

defendant’s yard about a month before Mercadiez drowned.

 On appeal, defendant argues that the trial court erred in admitting testimony

under Rules 403 and 404(b) about the 2010 drowning of Sadie Gates.15 I disagree.

 As our Supreme Court has observed:

 When the trial court has made findings of fact and
 conclusions of law to support its 404(b) ruling, as it did
 here, we look to whether the evidence supports the findings

15Although the subsection caption of defendant’s brief alleges that the trial court erred in denying her
motion in limine and admitting evidence regarding both the 2010 drowning and the incident when
defendant’s children were left unsupervised in her front yard, defendant only presents an argument
regarding the evidence of Sadie Gates’ drowning. Accordingly, defendant’s assertion that the trial
court erred in admitting evidence about the unsupervised children is deemed abandoned on appeal.
See N.C.R. App. P. 28(b)(6) (“Issues not presented in a party’s brief, or in support of which no reason
or argument is stated, will be taken as abandoned.”).

 18
 STATE V. REED

 STEPHENS, J., dissenting.

 and whether the findings support the conclusions. We
 review de novo the legal conclusion that the evidence is, or
 is not, within the coverage of Rule 404(b). . . .

 Rule 404(b) is a clear general rule of inclusion. The rule
 lists numerous purposes for which evidence of prior acts
 may be admitted, including motive, opportunity, intent,
 preparation, plan, knowledge, identity, or absence of
 mistake, entrapment or accident. This list is not exclusive,
 and such evidence is admissible as long as it is relevant to
 any fact or issue other than the defendant’s propensity to
 commit the crime. . . .

 Though it is a rule of inclusion, Rule 404(b) is still
 constrained by the requirements of similarity and temporal
 proximity. Prior acts are sufficiently similar if there are
 some unusual facts present in both crimes that would
 indicate that the same person committed them. We do not
 require that the similarities rise to the level of the unique
 and bizarre.

State v. Beckelheimer, 366 N.C. 127, 130-31, 726 S.E.2d 156, 159 (2012) (citations and

internal quotation marks omitted; italics added; emphasis in original).

 Here, the trial court summarized the similarities between the 2010 and 2013

drownings in its seven-page order as follows:

 There are sufficient similarities between the two events to
 support the [S]tate’s contention that the former incident is
 evidence that shows (1) knowledge on the part of
 [defendant] of the dangers and possible consequences of
 failing to supervise a young child who has access to or is
 exposed to bodies of water; (2) absence of accident; and (3)
 explains the context of her statements at the scene and
 later to law enforcement.

 Both events arose out of the supervision of children who
 were nineteen months old. [Defendant] was babysitting

 19
 STATE V. REED

 STEPHENS, J., dissenting.

 Sadie Gates who had been left with [defendant] on
 September 22, 2010 by her mother. A creek which had
 become swollen due to rainfall was located within 25 yards
 of [defendant’s] home. In places the water was five feet
 deep. Any barrier to keep the child away from this hazard
 had become ineffective. The property did not have a fence
 between the house and the creek. At the probable time of
 the incident [defendant] was engaged in caring for another
 child or watching a television program with her estranged
 husband who was in the home. The time period that the
 child was not being attended to by [defendant] had been
 estimated to be between five and fifteen minutes. The child
 was able to get out of the house through an unsecured door
 and off of a porch with ineffective child barriers.

 In the May [11], 2013 case, the victim was [defendant’s]
 nineteen[-]month[-]old daughter, Mercadiez Reed. She
 was able to leave the home through an unsecured door and
 gain access to an above ground swimming pool that was
 about four feet deep. [Defendant’s] husband and her
 children were in or about the home when the victim
 wandered out of the house. [Defendant] told law
 enforcement officers that she was in the bathroom for
 about five to ten minutes when the child probably left the
 home to go outside. She advised law enforcement that she
 did not watch the children in the pool because she was
 uncomfortable due to the previous incident.

Defendant contends that the thirteen findings of fact in the order were “inadequate

and incomplete” and thus failed to support the trial court’s conclusions of law that

the 2010 and 2013 drownings were sufficiently similar to permit admission of the

2010 evidence under Rule 404(b). Specifically, defendant contends that the 2010

drowning of Sadie Gates lacked any similarity to the 2013 drowning of Mercadiez on

 20
 STATE V. REED

 STEPHENS, J., dissenting.

“the most important issue, supervision[.]”16 Defendant misperceives the

requirements for admission of prior bad acts under Rule 404(b) and the purpose for

which the State sought to offer the evidence here.

 Defendant notes that while she admitted leaving the victim of the 2010

drowning completely unsupervised, there was voir dire testimony at the pretrial

hearing that she left Mercadiez in the same room as Mr. Reed before Mercadiez’s

drowning.17 I would conclude that this difference pales in comparison to the

numerous similarities between these tragic events. As the trial court noted, both

incidents involved (1) 19-month-old children (2) who were being supervised by

defendant (3) in her home (4) while her husband and other children were present (5)

who drowned (6) in nearby bodies of water (7) after getting out of defendant’s home,

and (8) when defendant had stepped away from the child’s immediate presence for a

period of approximately five to ten minutes. Further, the evidence was not offered to

prove that defendant failed to supervise Mercadiez, but rather, inter alia, to show

defendant’s knowledge “of the dangers and possible consequences of failing to

supervise a young child who has access to or is exposed to bodies of water[.]” Whether

defendant’s husband was with Mercadiez when defendant left the room before her

16On appeal, defendant does not argue that the two incidents lacked temporal proximity. See
Beckelheimer, 366 N.C. at 131, 726 S.E.2d at 159.

17As noted supra, unlike at the trial itself, the defense elicited testimony from Kellum about Mr.
Reed’s presence in the living room when defendant went to the bathroom on cross-examination at the
pretrial hearing.

 21
 STATE V. REED

 STEPHENS, J., dissenting.

daughter escaped from the house and drowned is irrelevant to the issue of defendant’s

knowledge of the possible consequences of leaving a toddler with unsupervised access

to an open source of water. Defendant’s knowledge of such danger, in turn, was highly

relevant to the jury’s determination of her (1) culpable negligence, an element of

involuntary manslaughter; (2) reckless disregard for human life, an element of

felonious child abuse; and (3) willfully or knowingly allowing a child to be in a

situation where the child could be adjudicated neglected, an element of contributing

to the neglect of a juvenile. See, e.g., State v. Fritsch, 351 N.C. 373, 379-80, 526 S.E.2d

451, 456 (2000), cert. denied, 531 U.S. 890, 148 L. Ed. 2d 150 (2000); see also N.C.

Gen. Stat. § 14-316.1 (2015) (defining contributing to delinquency by a parent as

“knowingly or willfully caus[ing] . . . any juvenile . . . to be in a place or condition . . .

whereby the juvenile could be adjudicated . . . neglected”). For these reasons, I agree

with the majority that the trial court properly concluded that evidence of the 2010

drowning was admissible under Rule 404(b).

 Nonetheless, North Carolina’s Rules of Evidence provide that even relevant

 evidence may . . . be excluded under Rule 403 if the trial
 court determines its probative value is substantially
 outweighed by the danger of unfair prejudice, confusion of
 the issues, or misleading the jury, or by considerations of
 undue delay, waste of time, or needless presentation of
 cumulative evidence. We review a trial court’s decision to
 exclude evidence under Rule 403 for abuse of discretion.
 An abuse of discretion results when the court’s ruling is
 manifestly unsupported by reason or is so arbitrary that it
 could not have been the result of a reasoned decision.

 22
 STATE V. REED

 STEPHENS, J., dissenting.

State v. Whaley, 362 N.C. 156, 159-60, 655 S.E.2d 388, 390 (2008) (citations and

internal quotation marks omitted).

 Defendant’s appellate argument regarding Rule 403 is simply that evidence of

the 2010 drowning was so lacking in probative value that it was outweighed by the

obvious prejudice of evidence that another toddler had previously drowned while in

defendant’s care. While I agree that it was prejudicial, as explained supra, the

evidence of the 2010 drowning was also highly probative of the issues before the jury

in this case. The trial court noted in its order that it had performed the required Rule

403 balancing test in regard to the 2010 drowning and determined that the probative

value of the evidence was not outweighed by unfair prejudice.

 My conclusion that this was a reasoned decision is further supported by the

trial court’s decision to defer ruling until trial on admission of the neighbor’s

testimony about unsupervised children in defendant’s yard and its ruling that

evidence about defendant’s possible drug use on the date of the 2010 drowning was

inadmissible under Rule 403. I see no abuse of discretion in the admission of evidence

about the 2010 drowning, and, accordingly, I agree with the statement in the majority

opinion that this argument by defendant lacks merit.

 23
 STATE V. REED

 STEPHENS, J., dissenting.

III. Motion to dismiss for insufficiency of the evidence

 I would also overrule defendant’s arguments that the evidence at trial was

insufficient to support her convictions for misdemeanor child abuse and contributing

to the delinquency of a juvenile by neglect.

 Taken together the State’s evidence at trial shows that defendant knew (1) how

quickly unsupervised toddlers in general could wander away into dangerous

situations, (2) that two of her young children, including a toddler who appears to have

been Mercadiez, had wandered unsupervised to the edge of the street only the month

before, (3) that some of defendant’s older children were in the habit of leaving gates

open which allowed younger children to wander, (4) how attractive and dangerous

open water sources like her backyard pool could be for toddlers, and (5) that defendant

had previously been held criminally responsible in the death of a toddler she was

babysitting after that child was left unsupervised inside defendant’s home for five to

fifteen minutes, managed to get outside, and wandered into a creek where she

drowned. Despite this knowledge, defendant still chose to (6) leave toddler Mercadiez

outside on a side porch (7) supervised only by other children (8) while defendant spent

five to ten minutes in a bathroom where she could not see or hear her youngest child.

 Regarding her conviction for misdemeanor child abuse, I agree with the

assertion in the majority opinion that the most factually analogous case to

defendant’s is State v. Watkins, __ N.C. App. __, 785 S.E.2d 175 (2016). In Watkins,

 24
 STATE V. REED

 STEPHENS, J., dissenting.

the defendant appealed from the denial of her motion to dismiss a charge of

misdemeanor child abuse. Id. at __, 785 S.E.2d at 176. The defendant was charged

after her son “James, who was under two years old, was left alone and helpless—

outside of [the d]efendant’s line of sight18—for over six minutes inside a vehicle with

one of its windows rolled more than halfway down in 18-degree weather with

accompanying sleet, snow, and wind.” Id. at __, 785 S.E.2d at 178.

 Given the harsh weather conditions, James’ young age, and
 the danger of him being abducted (or of physical harm
 being inflicted upon him) due to the window being open
 more than halfway, we believe a reasonable juror could
 have found that [the d]efendant “created a substantial risk
 of physical injury” to him by other than accidental means.
 See N.C. Gen. Stat. § 14-318.2(a).

 [The d]efendant acknowledges that her actions “may not
 have been advisable[] under the circumstances” but argues
 nevertheless that “this was not a case of child abuse.”
 However, the only question before us in an appeal from the
 denial of a motion to dismiss is whether a reasonable juror
 could have concluded that the defendant was guilty based
 on the evidence presented by the State. If so, even if the
 case is a close one, it must be resolved by the jury. See
 State v. Franklin, 327 N.C. 162, 170, 393 S.E.2d 781, 786-
 87 (1990) (“Although we concede that this is a close
 question . . . the State’s case was sufficient to take the case
 to the jury.”); State v. McElrath, 322 N.C. 1, 10, 366 S.E.2d
 442, 447 (1988) (upholding trial court’s denial of motion to
 dismiss even though issue presented was “a very close
 question”).

18 The evidence was conflicting on this point. The “[d]efendant testified that from where she was
standing in the Sheriff’s Office she ‘could look directly into my car and see my kid[,]’ ” while the
detective who was the primary witness for the State “testified that from where [the d]efendant was
positioned in the lobby she could not see her vehicle, which was parked approximately 46 feet away
from the front door.” Id. at __, 785 S.E.2d at 176, 177.

 25
 STATE V. REED

 STEPHENS, J., dissenting.

Id. (emphasis omitted). Mercadiez and James were each left unsupervised by their

mothers for a similarly short length of time—five to ten and six minutes, respectively.

However, the actual danger to which Mercadiez, who was awake and mobile, was

exposed during that time was significantly greater than that faced by James, who

was sleeping and confined. While leaving her toddler partially exposed to cold and

snowy weather for six minutes was certainly a poor decision by James’s mother, it

was unlikely to result in death and did not result in any actual injury to him. Indeed,

the law enforcement officer who spotted James sleeping in his mother’s car did not

feel the need to check the child’s well-being before the defendant left the scene.19

 As for the other risk suggested by this Court in Watkins, I would note that the

best available statistics indicate that drownings are far more common than nonfamily

abductions. In 2015, the National Center for Missing and Exploited Children 20

“assisted law enforcement with more than 13,700 cases of missing children[,]”

approximately 1% of which were nonfamily abductions. See The National Center for

Missing & Exploited Children, http://www.missingkids.com/KeyFacts (last visited

19The detective testified that he “noticed that [James], who appeared to be sleeping, had a scarf around
his neck. Before walking back into the building, [the detective] told [the d]efendant to turn on the
vehicle and ‘get some heat on that child.’ ” Id. at __, 785 S.E.2d at 176.

20 “The National Center for Missing & Exploited Children opened in 1984 to serve as the nation’s
clearinghouse on issues related to missing and sexually exploited children. Today NCMEC is
authorized by Congress to perform 22 programs and services to assist law enforcement, families and
the professionals who serve them.” The National Center for Missing & Exploited Children,
http://www.missingkids.com/About (last visited July 6, 2016).

 26
 STATE V. REED

 STEPHENS, J., dissenting.

July 6, 2016). The resulting estimate of 137 nonfamily child abductions annually is

dwarfed by the approximately 700 children under age 15 who drown in non-boating-

related incidents each year. See Centers for Disease Control and Prevention,

http://www.cdc.gov/homeandrecreationalsafety/water-safety/waterinjuries-factsheet.

html (last visited July 6, 2016) (“From 2005-2014, there were an average of 3,536

fatal unintentional drownings (non-boating related) annually in the United States . . .

. About one in five people who die from drowning are children 14 and younger.”).21

Indeed, “[d]rowning is responsible for more deaths among children [ages] 1-4 than

any other cause except congenital anomalies (birth defects).” Id. For children ages

1-4 years, home swimming pools are the most common location for drownings. Id. In

addition, “[f]or every child [age 14 and under] who dies from drowning, another five

receive emergency department care for nonfatal submersion injuries.” Id. Thus, I

take issue with the majority opinion’s characterization of Mercadiez’s drowning as

“the exceedingly rare situation that resulted in a tragic accident.” 22 The primary

21The Centers for Disease Control and Prevention is part of the Department of Health and Human
Services. See http://www.cdc.gov/about/organization/cio.htm (last visited July 6, 2016).

22I would further note the defendant in Watkins was prosecuted even though her child suffered no
harm at all, and, apparently, slept peacefully through the six-minute period when he was subjected to
substantial risk of physical injury. See Watkins, __ N.C. App. at __, 785 S.E.2d at 176.

 27
 STATE V. REED

 STEPHENS, J., dissenting.

distinction I see between this case and Watkins is that Mercadiez was exposed to far

greater risk when she was left unsupervised and subsequently drowned.23

 I find wholly unpersuasive the argument that Watkins and defendant’s case

are distinguishable on the basis of (1) the purposeful action of the parent in each case

and (2) the foreseeability of the potential harm to the unattended child:

 In Watkins, the defendant was aware of the harsh weather
 conditions, that the window was rolled down, and that she
 was leaving her child unattended in a public space; in other
 words, [the] defendant engaged in the purposeful conduct
 of leaving her child in the circumstances just enumerated;
 which is purposeful action that crosses the “accidental”
 threshold as “physical injury” in this case is very
 foreseeable, whether by hypothermia or abduction. From
 a commonsense standpoint, most, if not all parents, know
 there are inherent and likely dangers in leaving a child
 entirely alone in an open car in freezing weather in a public
 parking lot.

(Citation omitted).

23 The majority opinion dismisses as “irrelevant” these statistics regarding unintentional drownings,
asserting that “most unintentional drownings would likely also be described as ‘accidental drownings,’
and the issue here is whether the acts were by other than accidental means.” (Internal quotation marks
omitted). However, section 14-318.2, our misdemeanor child abuse statute, makes it a crime for the
parent of a child under age 16 to “allow[] to be created a substantial risk of physical injury, upon or to
such child by other than accidental means . . . .” N.C. Gen. Stat. § 14-318.2(a) (2015) (emphasis added).
Thus, it is the creation of the risk, rather than any actual harm that may befall a child, that must be
“by other than accidental means . . . .” Id. Here, the State’s evidence was that defendant decided to
leave Mercadiez playing outside without adult supervision while defendant went into a bathroom for
five to ten minutes. That decision to walk out of eyesight and earshot of her toddler, which created
the risk to Mercadiez, was not an accident, but a conscious, intentional choice. As for the CDC’s
statistics, I would assume that an unintentional drowning refers to any drowning that is not
intentional, i.e., the result of either suicide or homicide.

 28
 STATE V. REED

 STEPHENS, J., dissenting.

 First, I do not understand how a parent who left her sleeping child in a car for

six minutes while she went into a sheriff’s office “engaged in the purposeful conduct

of leaving her child in [those] circumstances[,]” but a parent who left her child playing

outside near a swimming pool for five to ten minutes while she went into a bathroom

did not. Both cases appear to me to involve “the purposeful conduct of leaving [a]

child in the circumstances” which the State argued were dangerous. If evidence that

a defendant left her sleeping toddler strapped in his car seat alone in a car parked in

front of a sheriff’s office in cold weather for six minutes was sufficient for “a

reasonable juror [to find] that [the d]efendant created a substantial risk of physical

injury to him by other than accidental means[,]” see Watkins, __ N.C. App. at __, 785

S.E.2d at 178 (internal quotation marks omitted), I have no trouble concluding that

evidence that a defendant who left her toddler outside without adult supervision for

five to ten minutes at a home with an outdoor swimming pool and a pool security gate

often left open by other children in the family was likewise sufficient to withstand a

motion to dismiss.

 Second, regarding foreseeability, I believe that, in addition to being aware of

the dangers of child abduction and hypothermia, “[f]rom a commonsense standpoint,

most, if not all parents, know there are inherent and likely dangers in leaving a child”

outside without supervision near a backyard swimming pool. Further, even if most

parents are not aware of the grave danger of drowning for unsupervised young

 29
 STATE V. REED

 STEPHENS, J., dissenting.

children, defendant was undeniably aware of the risk, given that she was still on

probation for her conviction of involuntary manslaughter in connection with Sadie

Gate’s death at the time of Mercadiez’s drowning. As noted supra, defendant was

also aware that the gate to the backyard pool was often left open by other children in

the home and that two of her younger children had recently been able to wander to

the edge of the street while they were at home and in defendant’s care.

 Finally, I take issue with the assertion in the majority opinion that, if we do

not find error in the trial court’s denial of defendant’s motion to dismiss, “any parent

who leaves a small child alone in her own home, for even a moment, could be

prosecuted if the child is injured during that time, not because the behavior she

engaged in was negligent or different from what all other parents typically do, but

simply because [hers] is the exceedingly rare situation that resulted in a tragic

accident.”24 Defendant left her toddler outside on a side porch without adult

supervision, not for a moment, but for five to ten minutes. Further, the evidence in

this case is that defendant knew the risk of a young child drowning when left

unsupervised, knew her own young children had a tendency to wander in the yard,

and knew her swimming pool was not always securely enclosed, yet still left

Mercadiez outside unsupervised for five to ten minutes.

24 See footnote 14, supra.

 30
 STATE V. REED

 STEPHENS, J., dissenting.

 As noted in the majority opinion, defendant’s conviction for contributing to the

delinquency of a minor was based upon the theory that she “knowingly or willfully

cause[d Mercadiez] . . . to be in a place or condition” where she “could be adjudicated

. . . neglected as defined by G.S. 7B-101[,]” see N.C. Gen. Stat. § 14-316.1, to wit, that

Mercadiez did “not receive proper care, supervision, or discipline[,]” see N.C. Gen.

Stat. § 7B-101(15) (2015) (emphasis added), from defendant in the moments before

she wandered unsupervised into the backyard pool and drowned. For all of the

reasons discussed supra, I can hardly conceive of a more textbook definition of failure

to properly supervise one’s toddler than to leave her outside without supervision for

five to ten minutes at a home with a backyard swimming pool and a security gate

that is often left ajar.

 Further, I reject the assertion in the majority opinion that the State’s theory

of the case was “that fathers are per se incompetent to care for young children” and

that the evidence was insufficient because the State produced “no evidence that

defendant reasonably should have known that Mr. Reed was in any way incompetent

to supervise Mercadiez when [defendant] went to the bathroom.” The State’s theory

of the case had nothing to do with fathers in general nor with Mr. Reed in particular.

Rather, as is clearly shown by the evidence it presented, the State’s theory was that

defendant left Mercadiez outside with Sarah and her young friends while defendant

spent five to ten minutes in a bathroom where defendant could not see Mercadiez,

 31
 STATE V. REED

 STEPHENS, J., dissenting.

even though defendant was aware that young children left unsupervised could

quickly wander into danger such as the family’s backyard pool. As discussed in

section I of this dissent, when ruling on defendant’s motion to dismiss, the trial court

could not consider Mr. Reed’s testimony that defendant left Mercadiez with him when

she went to the bathroom, and, thus, Mr. Reed’s competence to supervise Mercadiez

was simply irrelevant.

 In sum, taken in the light most favorable to the State, I conclude that there

was substantial evidence that defendant knowingly “create[d] or allow[ed] to be

created a substantial risk of physical injury” to Mercadiez, see N.C. Gen. Stat. § 14-

318.2(a), and allowed Mercadiez to be in a situation where she was not properly

supervised. See N.C. Gen. Stat. § 14-316.1. While this “evidence [may] not rule out

every hypothesis of innocence[,] . . . a reasonable inference of defendant’s guilt may

be drawn from the circumstances, and, thus, it was for the jury to decide whether the

facts, taken singly or in combination, satisf[ied it] beyond a reasonable doubt that the

defendant [was] actually guilty.” See Fritsch, 351 N.C. at 379, 526 S.E.2d at 455

(citation, internal quotation marks, and emphasis omitted). Accordingly, I would hold

that the trial court did not err in denying defendant’s motion to dismiss.

 32
 STATE V. REED

 STEPHENS, J., dissenting.

IV. Failure to intervene ex mero motu during the State’s closing argument25

 In a related argument, defendant contends that the trial court should have

intervened ex mero motu to strike the prosecutor’s comment during closing argument

that “just as she was responsible for the death of Sadie Gates, so, too, is [defendant]

responsible for the death of Mercadiez Reed.”26 Specifically, defendant contends that,

with this remark, the State was urging the jury to ignore the trial court’s Rule 404(b)

instruction regarding the purpose for which evidence of the 2010 drowning was

received. I am not persuaded.

 As an initial matter, I address the proper appellate standard of review for

defendant’s argument regarding the State’s closing remarks to the jury. The majority

opinion frames defendant’s argument as “that the State went so far beyond the scope

of the proper use of the admitted 404(b) evidence in its arguments to the jury that it

amounted to plain error in defendant’s trial[.]” Asserting that this argument “hinges

on the admission of evidence during the trial,” the majority applies plain error review.

While plain error review may be applied to unpreserved evidentiary issues, as

25 Although the caption of this portion of defendant’s brief states that “THE TRIAL COURT
COMMITTED PLAIN ERROR BY ALLOWING THE STATE TO ARGUE N.C.G.S. 8C-404(b)
EVIDENCE OUTSIDE ITS BASIS FOR ADMISSION[,]” the text of the argument cites only case law
regarding “improper closing arguments that fail to provoke [a] timely objection[,]” correctly noting the
proper standard of review as stated in State v. Jones, 355 N.C. 117, 558 S.E.2d 97 (2002).

26This statement is the only portion of the State’s closing argument cited by defendant in her brief.
Defendant does quote one other statement made by the State, but notes that it occurred during a
hearing on defendant’s pretrial motions and thus the jury did not hear it. Accordingly, we need not
consider its propriety.

 33
 STATE V. REED

 STEPHENS, J., dissenting.

discussed in section II of this dissent supra, defendant did object to the admission of

evidence regarding Sadie Gates’ drowning under Rules of Evidence 403 and 404(b).

See Beckelheimer, 366 N.C. at 130-31, 726 S.E.2d at 158-59 (discussing the

appropriate standard of review applied to appellate arguments under Rule 403—

abuse of discretion—and Rule 404(b)—de novo). More importantly, as noted in

footnotes 17 and 18 and discussed further below, defendant’s sole argument is that

the trial court erred in failing to intervene ex mero motu to a single remark made

during the State’s closing argument. Plain error review is not appropriate for such

appellate arguments. See State v. Wolfe, 157 N.C. App. 22, 33, 577 S.E.2d 655, 663

(2003) (“[T]he plain error doctrine is limited to errors in jury instructions and the

admission of evidence.”), disc. review denied and appeal dismissed, 357 N.C. 255, 583

S.E.2d 289 (2003).

 Instead, the correct

 standard of review for assessing alleged improper closing
 arguments that fail to provoke timely objection from
 opposing counsel is whether the remarks were so grossly
 improper that the trial court committed reversible error by
 failing to intervene ex mero motu. In other words, the
 reviewing court must determine whether the argument in
 question strayed far enough from the parameters of
 propriety that the trial court, in order to protect the rights
 of the parties and the sanctity of the proceedings, should
 have intervened on its own accord and: (1) precluded other
 similar remarks from the offending attorney; and/or (2)
 instructed the jury to disregard the improper comments
 already made.

 34
 STATE V. REED

 STEPHENS, J., dissenting.

Jones, 355 N.C. at 133, 558 S.E.2d at 107 (citation omitted). “[C]ounsel are given

wide latitude in arguments to the jury and are permitted to argue the evidence that

has been presented and all reasonable inferences that can be drawn from that

evidence.” State v. Richardson, 342 N.C. 772, 792-93, 467 S.E.2d 685, 697 (1996),

cert. denied, 519 U.S. 890, 136 L. Ed. 2d 160 (1996). Further, such “comments must

be viewed in the context in which they were made and in light of the overall factual

circumstances to which they referred.” State v. Call, 349 N.C. 382, 420, 508 S.E.2d

496, 519 (1998) (emphasis added).

 In addition to applying an incorrect standard of review, the majority opinion

mischaracterizes defendant’s argument on appeal regarding the State’s reference to

the death of Sadie Gates in its closing argument to the jury. In support of her

contention of gross impropriety in the State’s closing argument, defendant argues

that:

 The State’s . . . argument in essence encouraged the jury to
 ignore the trial court’s instructions regarding the 404(b)
 evidence, and the basis upon which it was received, i.e.,
 defendant’s knowledge of not supervising a minor child,
 and to find the defendant guilty because it had happened
 to another child in [defendant’s] care. . . . To suggest to the
 jury that it ignore a judge’s instructions is grossly
 improper. Knowing the extent of the dispute as to whether
 the 404(b) [evidence] should have been allowed into
 evidence, the court upon hearing the State’s argument
 should have stopped the argument of the State and
 reminded them that the evidence of [the] prior incident
 involving Sadie Gates was not to be considered to show a
 propensity on defendant’s part, and she was therefore

 35
 STATE V. REED

 STEPHENS, J., dissenting.

 guilty again, as the State was encouraging the jury to so
 find. “Just as she was responsible for the death of Sadie
 Gates, so, too, is she responsible for the death of Mercadiez
 Reed.”

(Emphasis added). Thus, defendant’s argument is simple and straightforward: that

when the challenged remark—“Just as she was responsible for the death of Sadie

Gates, so, too, is she responsible for the death of Mercadiez Reed”—was made, the

trial judge, ex mero motu, “should have stopped the argument of the State and

reminded them that the evidence of [the] prior incident involving Sadie Gates was

not to be considered to show a propensity on defendant’s part . . . .”

 The majority opinion does not directly address defendant’s argument, instead

undertaking a review of the State’s opening statement and direct examination of its

witnesses, in addition to portions of its closing argument not challenged by defendant,

and focusing on the number of times the State mentioned Sadie’s and Mercadiez’s

names during the trial. In support of its conclusion that “the State used the evidence

of Sadie’s death far beyond the bounds allowed by the trial court’s order[,]” the

majority suggests that, because Sadie’s name was used almost as frequently as

Mercadiez’s name was across the State’s opening statement, case-in-chief, and closing

argument, “[t]he State’s use of the evidence regarding Sadie went far beyond showing

that defendant was aware of the dangers of water to small children or any other

proper purpose as found by the trial court.” The majority opinion cites no authority

for the proposition that the frequency of reference to evidence admitted under Rule

 36
 STATE V. REED

 STEPHENS, J., dissenting.

404(b) throughout a trial is a pertinent consideration in assessing the alleged gross

impropriety of a single comment made during a closing argument, or, indeed, on any

legal issue. I would simply note that, in considering the appropriate use of Rule

404(b) evidence and in determining whether a prosecutor’s remark was so grossly

improper that a trial court erred in failing to intervene ex mero motu, precedent

requires that we consider the purpose and nature of statements rather than their

frequency. See Beckelheimer, 366 N.C. at 130-31, 726 S.E.2d at 159; see also Jones,

355 N.C. at 133, 558 S.E.2d at 107-08.

 I believe an analysis of defendant’s actual argument on appeal can lead only to

a conclusion that the State, far from making a grossly improper argument,

specifically cautioned the jury against letting its emotions get in the way of a proper

consideration of the evidence before it. A review of the challenged remark in context

reveals that, while the court did not interrupt the prosecutor to remind the jury of

the limited purposes for which the Sadie Gates evidence could be considered, the

prosecutor did give the jury an explicit reminder, essentially repeating the limiting

instruction given by the trial court:

 And just as she was responsible for the death of Sadie
 Gates, so, too, is she responsible for the death of Mercadiez
 Reed. Not a sibling, not [Mr.] Reed, but her. She is the
 person that can and should be held criminally responsible
 for her daughter’s death, because she is the only person
 who knew of the dangers, who had been negligent before,
 and who acted in a grossly negligent manner.

 37
 STATE V. REED

 STEPHENS, J., dissenting.

 Because of Sadie Gates’s death, she had knowledge of the
 dangers of failing to supervise a child. She knew that if you
 didn’t watch a child, bad things can happen and the child
 can die. Sadie’s death gave her direct, firsthand knowledge
 of that, and also put a greater responsibility on her to ensure
 that no child under her care is left unsupervised, in a
 dangerous situation.

 Now, you’re not here to decide her responsibility for Sadie
 Gates’s death, and that evidence has not been presented to
 you to anger or inflame you, or prove that she’s a bad parent.
 It’s been offered to you, and should be considered by you, for
 the limited purpose of showing that she had direct
 knowledge of the dangers of failing to supervise a child who
 has access to water. It is important, because it shows her
 conduct rose to the level of gross carelessness or
 recklessness that amounted to the heedless indifference of
 safety and rights of others.

(Emphasis added).27 In my view, when read in context, the comment defendant

challenges can only be interpreted as part of the State’s argument that the 2010

drowning death of Sadie Gates was evidence of defendant’s knowledge of the dangers

of leaving a toddler near an accessible source of water, which as noted supra was

offered to prove essential elements of both felonious child abuse and involuntary

manslaughter. In light of the State’s emphasis on the knowledge the 2010 drowning

gave defendant about the danger of open water sources to very young children and

27 The majority asserts that, “[b]y referencing only the portion of the State’s closing argument that
stayed within the Rule 404(b) bounds, it is the dissent [that] is taking the use of the evidence out of
context.” To the contrary, I focus on this portion of the State’s closing statement because it includes
the remark actually challenged by defendant and the context necessary to address her appellate
argument. See, e.g., Viar v. N.C. Dep’t of Transp., 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) (per
curiam).

 38
 STATE V. REED

 STEPHENS, J., dissenting.

its explicit reminder of the limited purpose for which the jury could consider that

evidence, the challenged remark was not improper, let alone “so grossly improper that

the trial court committed reversible error by failing to intervene ex mero motu.” See

Jones, 355 N.C. at 133, 558 S.E.2d at 107. I would overrule this argument.

V. Conclusion

 I would hold that the trial court did not err in denying defendant’s motions to

dismiss, admitting evidence of Sadie Gates’ drowning, or failing to intervene ex mero

motu in the State’s closing argument.

 39